*James Matthew Leidig v. State of Maryland*, No. 19, September Term, 2020. Opinion by Biran, J.

**CONSTITUTIONAL LAW – SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION – ARTICLE 21 OF THE MARYLAND DECLARATION OF RIGHTS – RIGHT OF ACCUSED TO CONFRONT WITNESSES – FORENSIC EVIDENCE –** The Confrontation Clause of the Sixth Amendment to the United States Constitution provides a criminal defendant with the right "to be confronted with the witnesses against him." Article 21 of the Maryland Declaration of Rights similarly provides that, "[i]n all criminal prosecutions, every man hath a right … to be confronted with the witnesses against him; … [and] to examine the witnesses for and against him on oath." In *Williams v. Illinois*, 567 U.S. 50 (2012), the Supreme Court considered whether a laboratory report containing the results of DNA analysis was "testimonial" within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2004). *Williams* resulted in a fractured decision, revealing that there was not a majority position on the Supreme Court concerning the minimum requirements for a forensic test report to qualify as testimonial for purposes of the Sixth Amendment.

The Court of Appeals held that Article 21 provides greater protection than the Sixth Amendment, as currently interpreted by the Supreme Court, with respect to what qualifies as a testimonial document, thereby triggering the rights of confrontation and cross-examination. The Court held that, under Article 21, a scientific report is "testimonial" if the author of the report reasonably would have understood that the primary purpose for the creation of the report was to establish or prove past events potentially relevant to later criminal prosecution.

In this case, the trial court admitted a DNA report into evidence at Petitioner's trial without requiring the author of the report to be available for cross-examination. The Court held that this violated Petitioner's rights to confrontation and cross-examination under Article 21.

Circuit Court for Washington County
Case No. C-21-CR-19-000099
Argued: December 3, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 19

September Term, 2020

JAMES MATTHEW LEIDIG

v.

STATE OF MARYLAND

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Biran, J.
Watts, J., concurs.

Filed: August 5, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides a criminal defendant with the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Article 21 of the Maryland Declaration of Rights, which predates the Sixth Amendment by more than a decade, similarly provides that, "[i]n all criminal prosecutions, every man hath a right … to be confronted with the witnesses against him; … [and] to examine the witnesses for and against him on oath." Md. Decl. of Rts. art. 21. For the past several decades, this Court has read the Sixth Amendment and Article 21 as providing equivalent confrontation rights to criminal defendants in Maryland. In this case, we consider whether to adhere to that approach.

In 2004, the Supreme Court decided the groundbreaking case of *Crawford v. Washington*, 541 U.S. 36 (2004), in which the Court held that an out-of-court "testimonial statement" of a witness who does not testify at trial is admissible under the Confrontation Clause of the Sixth Amendment "only where the declarant is unavailable and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. *Crawford* involved a tape-recorded statement to police by a witness in which she described a stabbing. There was no dispute that the witness's statement was "testimonial."

In a trio of cases over the next decade, the Supreme Court considered the applicability of *Crawford* to forensic test results. The last of those cases, *Williams v. Illinois*, 567 U.S. 50 (2012), resulted in a fractured decision, and revealed that there was not a majority position on the Supreme Court concerning the minimum requirements for a forensic test report to qualify as testimonial. In the nine years that have passed since the Court decided *Williams*, the lower federal courts and many state appellate courts (including

this Court) have struggled to apply *Williams* to various fact patterns involving forensic reports. The appeal presently before us illuminates the difficulties inherent in applying the Supreme Court's confrontation jurisprudence in cases involving scientific evidence.

In the Circuit Court for Washington County, Petitioner James Matthew Leidig was indicted by a grand jury on charges of first-, third-, and fourth-degree burglary, theft, and malicious destruction of property. A police officer who responded to the scene of the reported burglary discovered broken glass around the window that appeared to be the burglar's point of entry. The officer swabbed what he suspected was the burglar's blood from the window frame and a curtain. Molly Rollo, a forensic scientist with the Maryland State Police, subsequently conducted a serological examination and deoxyribonucleic acid (DNA) analysis of the samples. She then produced a report in which she concluded that blood was indicated on the swabs, and that the DNA source of the blood samples taken from both the window frame and the curtain was one male contributor. Ms. Rollo's report provided a DNA profile for that male contributor. A subsequent DNA records database search identified Leidig as a possible match.

At Leidig's trial, the State did not call Ms. Rollo as a witness. Rather, the State presented the testimony of a different forensic scientist, Tiffany Keener. Ms. Keener had analyzed a reference sample collected from Leidig after he became a suspect in the burglary, and then had compared the DNA profile she generated from that known sample to the DNA profile that Ms. Rollo had generated from the forensic samples. Over Leidig's objection, the trial court allowed the State to introduce Ms. Rollo's report into evidence, and to elicit Ms. Keener's expert opinion that Leidig's known DNA profile matched the

DNA profile that had been generated from the samples taken at the scene of the crime. The matching DNA profiles constituted the only evidence that linked Leidig to the burglary.

The jury convicted Leidig of third- and fourth-degree burglary and malicious destruction of property having a value of less than $1,000. The Court of Special Appeals affirmed Leidig's convictions, holding that the admission of Ms. Rollo's report into evidence did not violate Leidig's rights under the Sixth Amendment and Article 21.

As discussed below, it is unclear how the Supreme Court would decide the Sixth Amendment issue in this case. Assuming without deciding that Ms. Rollo's report is not "testimonial" for purposes of a Sixth Amendment confrontation analysis, we conclude that a different standard of what is testimonial applies under Article 21. We hold that, under Article 21, a scientific report is "testimonial" if the author of the report reasonably would have understood that the primary purpose for the creation of the report was to establish or prove past events potentially relevant to later criminal prosecution. Under that standard, the trial court's admission of the forensic test results in this case, without giving Leidig the opportunity to cross-examine Ms. Rollo, violated Article 21.

# I

## Background

### A. The Investigation of the Burglary

Shortly after 2:00 p.m. on September 1, 2016, Sergeant David Haugh[1] of the Washington County Sheriff's Department responded to a reported burglary at the home of Ralph and Rebecca Brown in Hagerstown, Maryland. When Sergeant Haugh arrived, he met with the Browns and learned that neither of them was home during the alleged burglary. The Browns told Sergeant Haugh that, after they returned home, they discovered that someone had forced entry into their home through one of their living room windows and had stolen Mr. Brown's Smith & Wesson 38 Special revolver and its holster.

Following his discussion with the Browns, Sergeant Haugh identified a window that appeared to have been forced inward and concluded it was the burglar's point of entry. The window was adorned with white curtains. Sergeant Haugh discovered fragments of glass on the floor below the window. Upon closer inspection of the window, Sergeant Haugh noticed a dark reddish substance on the window's frame and on a curtain. He suspected that the substance might be blood. After confirming that neither of the Browns had cut themselves, Sergeant Haugh swabbed the window frame and the curtain two times each. On September 2, 2016, Sergeant Haugh placed the two swabs of suspected blood from the

---

[1] On the date of the burglary, Sergeant Haugh held the rank of Corporal. By the time Leidig's case went to trial, Haugh had been promoted to Sergeant; we shall refer to him as Sergeant Haugh.

window frame and the two swabs of suspected blood from the curtain into the property room at the Washington County Sheriff's Office.

## B. The Forensic DNA Analysis: Molly Rollo's Report

On September 7, 2016, the swabs were sent to the Maryland State Police Forensic Sciences Division in Pikesville for DNA analysis and possible entry in the Combined DNA Index System ("CODIS").[2] At the Pikesville Laboratory in the Biology Unit, Molly Rollo conducted a serological and DNA analysis of the swabs.[3] She prepared a report detailing her analysis, results, and conclusions. This document – titled a "LABORATORY REPORT" – was addressed to then-Corporal Haugh and listed the "requestor's" case number as well as the laboratory's file number. The report identified the "[v]ictim" as Mr. Brown and the "[s]uspect" as "unknown." The report contained the following prefatory language:

> This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory Report will be used for official purposes only related to the investigation or a subsequent criminal prosecution. This report contains the conclusions, opinions and interpretations of the examiner whose signature appears on the report.

---

[2] CODIS is a system administered and operated by the Federal Bureau of Investigation (FBI) that allows federal, state, and local forensic DNA laboratories to store and exchange DNA records. *See* FBI, *Combined DNA Index System (CODIS)*, available at https://perma.cc/RNB8-96SA. It was established by Congress "to assist in providing investigative leads for law enforcement in cases where no suspect has yet been identified." FBI, *Frequently Asked Questions on CODIS and NDIS*: *CODIS DNA Databases*, no. 4, available at https://perma.cc/VTV8-PVPB ("CODIS/NDIS FAQ").

[3] For a discussion of DNA analysis in the context of DNA evidence, also known as DNA profiling, see *Young v. State*, 388 Md. 99, 106-12 (2005).

The first section of the report, titled "Results and Conclusions of Examination/Analysis," began with the following statement of validation[4]:

> The deoxyribonucleic acid (DNA) results reported below were determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories.

The results and conclusions section of the report stated that "[b]lood was indicated" on exhibit 1 (swabs of the window frame) and exhibit 2 (swabs of the living room curtain) and that both exhibits "were forwarded for DNA extraction and quantitation."

The next section of the report provided "Quantitation Results." In that section, Ms. Rollo reported that "[h]uman and male DNA was detected" in both exhibits and that the exhibits "were processed for autosomal short tandem repeat (STR) DNA analysis and were amplified and typed at sixteen genetic loci." The "Autosomal STR Typing Results and Conclusions" subsection included a two-column table listing 16 loci with one or two alleles at each locus for both exhibits, along with a conclusion that "[a] DNA profile from one male contributor was obtained."

In the "Notes" section of the report, Ms. Rollo wrote that "[t]he DNA profile from the swabs of the window frame … will be entered into the National DNA Index System

---

[4] To be admissible under the applicable Maryland statute, a forensic analysis report that includes a DNA profile must contain a statement of validation. *See* Md. Code Ann., Cts. & Jud. Proc. § 10-915(b) (2020 Repl. Vol.).

6

(NDIS)[5, 6] database." The report was dated October 14, 2016 and was signed by Ms. Rollo

as the "Examiner." The handwritten initials of three individuals, "TK[,]" "LAM[,]" and

---

[5] NDIS is the national-level component of CODIS. *See* CODIS/NDIS FAQ, at no. 10. It allows participating laboratories in all 50 states, the District of Columbia, the federal government, the U.S. Army Criminal Investigation Laboratory, and Puerto Rico to maintain and exchange DNA records. *Id.*

[6] DNA data submitted to NDIS must meet the following requirements:

1. The DNA data must be generated in accordance with the FBI Director's Quality Assurance Standards;
2. The DNA data must be generated by a laboratory that is accredited by an approved accrediting agency;
3. The DNA data must be generated by a laboratory that undergoes an external audit every two years to demonstrate compliance with the FBI Director's Quality Assurance Standards;
4. The DNA data must be one of the categories of data acceptable at NDIS, such as convicted offender, arrestee, detainee, legal, forensic (casework), unidentified human remains, missing person, or a relative of missing person;
5. The DNA data must meet minimum CODIS Core Loci requirements for the specimen category;
6. The DNA Polymerase Chain Reaction (PCR) data must be generated using PCR accepted kits; and
7. Participating laboratories must have and follow expungement procedures in accordance with federal law.

CODIS/NDIS FAQ, at no. 18. Ms. Rollo's report listed the 13 loci that comprised the Original CODIS Core Loci (in effect from October 1998 until December 31, 2016), *see id.* at no. 19, in the STR typing results table, in addition to three others: D2S1338, D19S433, and amelogenin. The amelogenin gene is tested for gender identification. *See* National Institute of Standards and Technology, U.S. Department of Commerce, *Amelogenin*, available at https://perma.cc/4AMA-CBXN. Ms. Rollo reported "XY" results for the amelogenin tests conducted on both exhibits, indicating a male contributor. *See id.*

"MR," appeared on the bottom of the first page of the report, and "TK" and "LAM" also appeared on the second page of the report below Ms. Rollo's signature.[7]

Sergeant Haugh received Ms. Rollo's report on October 31, 2016. On November 4, 2016, Sergeant Haugh learned that there was a "DNA hit" in NDIS on the DNA profile generated by Ms. Rollo.[8] The hit revealed Leidig, who had a criminal record in Pennsylvania, as a potential match in the system. Subsequently, Sergeant Haugh obtained a search warrant to collect a DNA reference sample from Leidig.[9]

## C. The Known Biological Sample Analysis: Tiffany Keener's Report

On November 15, 2016, Sergeant Haugh obtained a reference sample from Leidig using two buccal (cheek) swabs. Those swabs were submitted to the Pikesville Laboratory for analysis on March 15, 2017. In the Biology Unit, Tiffany Keener examined Leidig's known sample. Ms. Keener produced a report that was substantially similar in form to Ms. Rollo's report. It included the same case information contained in Ms. Rollo's report, but named Leidig as the suspect. It began with the same prefatory acknowledgement (that the

---

[7] A copy of Ms. Rollo's report is included as Appendix A to this opinion.

[8] CODIS/NDIS compares "a target DNA record against the DNA records contained in the database." CODIS/NDIS FAQ, at no. 3. A comparison in CODIS may reveal two types of hits: an "offender hit" or a "forensic hit." *Id.* at no. 4. An offender hit is one where the identity of a potential suspect is revealed. *Id.* A forensic hit links the DNA profiles from two or more crime scenes, but the DNA source remains unknown. *Id.*

[9] A DNA database match "may only be used as probable cause and is not admissible at trial unless confirmed by additional testing." Md. Code Ann., Pub. Safety ("PS") § 2-510 (2018 Repl. Vol.); *see Allen v. State*, 440 Md. 643, 676 (2014) ("[PS § 2-510] requires that once a match is determined, a sample from the individual identified in the DNA data base must be obtained and analyzed to compare it to the sample obtained from the crime scene.").

report would be used for "official purposes only related to the investigation or a subsequent criminal prosecution" and that the report contained the examiner's "conclusions, opinions, and interpretations") with one addition: "This report is supplemental to the original Maryland State Police report dated October 14, 2016."

Like Ms. Rollo's report, Ms. Keener's "Results and Conclusions of Examination/Analysis" section began by stating that the DNA results set forth in the report were "determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories." Next, the report identified the sample being tested as a "[k]nown oral standard from James Leidig," which Ms. Keener referred to as "exhibit 3" (to differentiate it from the two exhibits Ms. Rollo had previously analyzed). The report further stated that exhibit 3 "was forwarded for DNA extraction and quantitation."

The next section of the report provided the "Quantitation Results" for Leidig's known sample. In that section, Ms. Keener reported that "[h]uman and male DNA was detected" in exhibit 3, and that exhibit 3 "was processed for autosomal short tandem repeat (STR) DNA analysis and was amplified and typed at twenty-four loci." The autosomal STR typing results table in Ms. Keener's report contained three columns (in contrast to the two-column table from Ms. Rollo's report). The first two columns reiterated the typing results for the two exhibits Ms. Rollo had tested. The new third column was captioned "James Leidig" and it identified the same alleles at each locus that had been tested by Ms. Rollo.

Ms. Keener recounted that the swabs of the window frame and the living room curtain had generated a DNA profile from one male contributor. Ms. Keener then concluded that Leidig's DNA profile

> matches this DNA profile at all autosomal loci tested except D2S441, D22S1045, SE33, D10S1248, D1S1656 and D12S391.[10] The probabilities of selecting an unrelated individual at random having this DNA profile are approximately:

| Population Database | Frequency |
|---|---|
| US Caucasian | 1 in 9.7 Sextillion ($9.7 \times 10^{21}$) |
| African American | 1 in 3.0 Septillion ($3.0 \times 10^{24}$) |
| US Hispanic | 1 in 5.0 Sextillion ($5.0 \times 10^{21}$) |

> Because the rarity of this profile exceeds 1 in 333 billion, it is unreasonable to conclude that an unrelated individual would be the source of this DNA profile.

> The report was dated April 17, 2017 and signed by Ms. Keener as the "Examiner."

The initials of three individuals (including "T.K.") appeared on the bottom of the first two pages of the report and two sets of initials (not including "T.K.") appeared on the third page of the report below Ms. Keener's signature.[11]

---

[10] The column for exhibit 3 reported test results for eight additional loci that were not included in Ms. Rollo's report. Thus, in Ms. Keener's report, the columns for exhibits 1 and 2 stated that those eight loci were "[n]ot [t]ested." Ms. Keener explained at trial that, between the time Ms. Rollo tested the forensic samples and the time that Ms. Keener tested Leidig's known sample, the Pikesville Laboratory began using a different test kit that tested additional loci. We note that, as of January 1, 2017, the CODIS Core Loci added seven new loci. *See* CODIS/NDIS FAQ, at no. 19. Ms. Keener reported test results for Leidig's known sample as to the seven new CODIS Core Loci, as well as for amelogenin, yindel (another sex marker), and two other loci not included in the CODIS Core Loci.

[11] A copy of Ms. Keener's report is included as Appendix B to this opinion.

## D. The Trial

Leidig's trial went forward on March 12, 2019 in the Circuit Court for Washington County. During the State's case-in-chief, four witnesses testified: Mr. Brown, Mrs. Brown, Sergeant Haugh, and Ms. Keener. Although the State subpoenaed Ms. Rollo, the State did not produce her as a witness. There was no eyewitness testimony linking Leidig to the scene of the alleged crime.

Ms. Keener was the State's final witness and its DNA expert. She began her testimony by explaining serology testing, DNA analysis, the STR typing procedure, and the safeguards used in the Biology Unit to ensure the integrity of the evidence and the testing procedures. She testified that the steps she described are "the same procedures that all the analysists use at the Maryland State Police."

Regarding the DNA profile that connected Leidig to the alleged crime scene, Ms. Keener confirmed that Ms. Rollo was the "primary forensic scientist" who analyzed the forensic samples collected at the Browns' home. Ms. Keener testified that each forensic scientist's work "must be peer reviewed by two separate analysts before the report is released." The prosecutor showed Ms. Keener a copy of Ms. Rollo's report, which had been marked for identification. Ms. Keener stated that she was the "administrative reviewer" for Ms. Rollo's report, and that "[o]n the bottom of each page I initialed indicating I agree with her results and conclusions."[12] Leidig's attorney then objected to

---

[12] Each CODIS/NDIS laboratory participant must "conduct and document administrative and technical reviews of all case files and reports to ensure conclusions and supporting data are reasonable and within the constraints of scientific knowledge." FBI,

Ms. Keener's testimony, contending that "the State has the wrong expert here," and making arguments for exclusion of the evidence based on hearsay and confrontation grounds. The trial court overruled the objection.

After Ms. Keener affirmed that Ms. Rollo's report was "the type of report that is routinely kept in the normal course of business at the Maryland State Police Crime Lab" and was also "the type of report that a forensic scientist … relies upon when doing comparisons with other individuals," Ms. Rollo's report was admitted into evidence.

Next, Ms. Keener testified about her analysis of Leidig's DNA reference sample and the report containing her results and conclusions. Specifically, she said: "I performed the DNA analysis and I compared my results to the results that were previously obtained

---

*Quality Assurance Standards for Forensic DNA Testing Laboratories*, Standard 12.1 (2011), available at https://perma.cc/D227-A2GU ("FBI QAS").

An "administrative review" consists of "an evaluation of the report and supporting documentation for consistency with laboratory policies and for editorial correctness." *Id.* at Std. 2 (definitions). This type of review must include "[a] review of the case file and final report for clerical errors" and also ensures that certain information is included in the report (*e.g.*, "signature and title, or equivalent identification, of the person accepting responsibility for the content of the report"); "[a] review of chain of custody and disposition of evidence"; and "[a] procedure to document the completion of the administrative review." *Id.* at Std. 12.3. A "technical review" is more substantive. *See Cooper v. State*, 434 Md. 209, 219-20 (2013) (summarizing witness testimony distinguishing between an administrative review and a technical review). Among other things, it is "an evaluation of reports, notes, data, and other documents to ensure there is an appropriate and sufficient basis for the scientific conclusions." FBI QAS, at Std. 2. In other words, a technical reviewer verifies the information contained in the report. *See* FBI QAS, at Std. 12.2.

In *State v. Miller*, No. 24 (Md. Aug. 5, 2021), which we also decide today, we consider the significance of a technical review in the context of a confrontation challenge to the admission of DNA evidence.

from Molly Rollo." She continued: "My findings were that from the DNA profile obtained from the swabs of both the window frame and the living room curtain that the DNA profile from James Leidig matched the DNA profile obtained from both of those items." She concluded, as provided in her report, that

> [t]he probabilities of selecting an unrelated individual at random that would have the same DNA profile from what was obtained from the swabs of the window frame and living room curtain are approximately one in 9.7 sextillion in the US Caucasian population. Approximately one in 3.0 sextillion within the African American population and approximately one in 5.0[] sextillion within the US Hispanic population.

Ms. Keener also confirmed that "[s]eals were intact" when she began her examination of Leidig's known sample, and affirmed that she "employed and followed" all the "safeguards" when conducting that examination and generating a DNA profile from Leidig's reference sample.

After Ms. Keener explained the results of her analysis, she testified about Ms. Rollo's serology tests on the forensic samples collected at the Browns' home, and told the jury that "[Ms. Rollo's] result was that blood was indicated on both the swabs of the window frame and of the living room curtain." Next, Ms. Keener affirmed that her report was "the type of report that is routinely kept in the normal course of business at the Maryland State Police Crime Lab," and the trial court admitted Ms. Keener's report into evidence over Leidig's objection.

In his closing argument, the prosecutor reminded the jury that the DNA expert, Ms. Keener, testified that "the sample that was obtained from the curtain was a match to the sample that was obtained from the windowsill and that that was a match, that that profile

13

was a match to Mr. Leidig" and contended that "it is statistically impossible that there is another individual in the US that could have left that DNA sample there that is not James Leidig."

The jury acquitted Leidig of first-degree burglary and theft and found him guilty of third- and fourth-degree burglary and malicious destruction of property. On May 9, 2019, the court sentenced Leidig to eight years of imprisonment and ordered him to pay restitution in the amount of $886.95.

### E. Appeal

In his appeal of his convictions and sentence, Leidig claimed two errors: (1) his restitution order was illegal because he was acquitted of first-degree burglary and theft; and (2) the trial court violated his confrontation rights when it admitted DNA evidence through a witness who did not perform the serological or DNA analysis of the crime scene evidence. In an unreported opinion, the Court of Special Appeals vacated the restitution order but affirmed Leidig's convictions. *Leidig v. State*, No. 463, Sept. Term 2019, 2020 WL 2128837 (Md. Ct. Spec. App. May 5, 2020). Relevant to the appeal before us, the intermediate appellate court concluded that Ms. Rollo's report was not "testimonial" because it was neither "formal" within the meaning of Justice Thomas's opinion concurring in the judgment in *Williams v. Illinois*, *see* 567 U.S. at 110-13 (Thomas, J., concurring), nor "accusatory" within the meaning of Justice Alito's plurality opinion in *Williams*, *see id.* at 81-86 (plurality op.). *Leidig*, 2020 WL 2128837, at *5-6. Accordingly, the court held that Leidig's right to confrontation was not violated when the trial court admitted Ms. Rollo's report without Ms. Rollo present for cross-examination. *Id.*

14

Leidig filed a petition for *certiorari* asking this Court "to clarify when a forensic report constitutes testimonial hearsay such that the defendant has the right to confront the analyst who prepared the report." We granted Leidig's petition, *Leidig v. State*, 469 Md. 657 (2020), and agreed to review the following question:

> Did the trial court violate [Leidig]'s right to confrontation under the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights when it admitted DNA and serological evidence through a witness who did not perform the analysis of the crime scene evidence?

## II

### Standard of Review

The decision to admit evidence is ordinarily reviewed for abuse of discretion. *See, e.g.*, *Wheeler v. State*, 459 Md. 555, 560-61 (2018). However, this case presents a question of law and fact. Accordingly, our review is *de novo*. *Langley v. State*, 421 Md. 560, 567 (2011).

## III

### Discussion

As stated at the outset, a criminal defendant in a Maryland court has the right to confront and cross-examine adverse witnesses under both the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. A sea change in Sixth Amendment jurisprudence occurred in 2004, when the Supreme Court decided *Crawford v. Washington*. We begin our discussion with a short history of the origins of Article 21. Then, we summarize several pertinent confrontation cases from the decades leading up to *Crawford*. Next, we discuss *Crawford* itself, its follow-up case in

the Supreme Court, *Davis v. Washington*, 547 U.S. 813 (2006), and their application to subsequent cases in the Supreme Court and this Court involving scientific evidence. Then, using this appeal as a test case, we determine that it is necessary and appropriate to adopt our own standard under Article 21 regarding what makes an out-of-court statement "testimonial." Applying that standard, we conclude that the admission of Ms. Rollo's report and Ms. Keener's testimony reporting Ms. Rollo's results violated Leidig's right to confrontation and cross-examination under Article 21.

## A. Article 21

Article 21 of the Maryland Declaration of Rights was ratified in November 1776 (then as Article 19 of the Declaration of Rights) and has been part of Maryland's Constitution ever since. It sets forth six rights that protect those accused of crimes:

> **Rights of accused; indictment; counsel; confrontation; speedy trial; impartial and unanimous jury.** That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

Md. Decl. of Rts. art. 21.

The Sixth Amendment (ratified by the States in 1791), by contrast, does not explicitly reference a right to examine witnesses under oath, but rather provides a right to the accused "to be confronted with the witnesses against him." Nor did the declarations of rights of Virginia and Pennsylvania, which were ratified prior to Maryland's Declaration of Rights, refer to the examination of witnesses. Section Eight of the Virginia Declaration

16

of Rights (adopted on June 12, 1776) stated "[t]hat in all capital or criminal prosecutions a man hath a right to … be confronted with the accusers and witnesses[.]" The Pennsylvania Constitution (ratified on September 28, 1776) included a declaration of rights containing a confrontation right similar to that of Virginia: "That in all prosecutions for criminal offenses, a man hath a right … to be confronted with the witnesses[.]" After Maryland's adoption of its Constitution, several other states adopted declarations of rights or bills of rights that contained the right of an accused to "confront"[13] (or to be "confronted with"[14]) witnesses or to "meet the witnesses against him face to face"[15] without an additional right to "examine" witnesses.

The text of Article 21 indicates that the "assembly of freemen"[16] who drafted the Declaration of Rights drew upon the similar provisions of Virginia and Pennsylvania, and that the later states (and the federal Constitution) similarly drew upon prior declarations of a right to confrontation. The historical record does not explain why Maryland chose to add a separate right to examine witnesses, whereas the other states and the federal Constitution did not do so. However, the assembly of freemen surely understood that they had included additional language regarding examination of witnesses that was not contained in the

---

[13] *See* North Carolina Declaration of Rights § VII (Dec. 8, 1776).

[14] *See* Vermont Declaration of Rights Ch. I, § X (1777).

[15] *See* Massachusetts Declaration of Rights § XII (1780); New Hampshire Bill of Rights § XV (1783).

[16] This body constituted Maryland's first General Assembly. *See Maryland Manual On-Line: A Guide to Maryland & Its Government*, Maryland State Archives (Jan. 31, 2018), available at https://perma.cc/3FQ6-NV7B.

17

Virginia and Pennsylvania declarations of rights. That is, the Maryland framers chose to make explicit that a criminal defendant not only has the right to meet the witnesses against him face-to-face, but also to examine them under oath.

## B. Pre-*Crawford* Jurisprudence on Confrontation

Prior to the incorporation of the Sixth Amendment against the States in 1965, *see Pointer v. Texas*, 380 U.S. 400, 403 (1965), the "nature, scope, and meaning of the right of confrontation in Maryland developed solely from the opinions of the Court of Appeals in the context of Article 21[.]" *Gregory v. State*, 40 Md. App. 297, 311 (1978).

In the earliest cases interpreting Article 21, this Court stated in broad terms that Article 21 does not restrict the State's presentation of evidence to live testimony. *See Johns v. State*, 55 Md. 350, 360 (1881) ("In declaring that the party accused shall have the right to be confronted with the witnesses against him, that provision of the Declaration of Rights is not to be understood as excluding all other evidence except oral evidence of witnesses produced in Court. Such has never been its interpretation, nor does the language warrant it. It is only where the prosecution is to be maintained by the testimony of living witnesses that they are required to be produced in Court, confronted with the accused, and deliver their testimony under the sanction of an oath, and be subject to cross-examination."); *Jones v. State*, 205 Md. 528, 533 (1954) (relying on *Johns* to conclude there was no Article 21 violation in the State's reliance on a hospital record to prove a key fact; "the right of confrontation does not apply to documentary evidence, and … the legislature has the constitutional power to change the common law rules of evidence as to what documents are admissible and the weight to be attributed to them, even in criminal cases"). Thus,

18

according to the Court of Special Appeals in *Gregory*, "as of 1965, the law of Maryland (*Johns* and *Jones*) seemed to be that the right of confrontation did not apply to documentary evidence in any form, including hospital records; and that, if a document was otherwise admissible under traditional or statutory rules of evidence, it was not rendered inadmissible under Article 21, regardless of what it contained." *Gregory*, 40 Md. App. at 314.

In *Pointer v. Texas*, the Supreme Court declared that "the Sixth Amendment's right of an accused to confront the witnesses against him is ... a fundamental right and is made obligatory on the States by the Fourteenth Amendment." 380 U.S. at 403. Maryland courts analyzing confrontation issues after *Pointer* began the practice of applying the Sixth Amendment, while stating that Article 21 provides "the same right." *Moon v. State*, 300 Md. 354, 359 (1984) (quoting *Crawford v. State*, 282 Md. 210, 211 (1978)); *see also, e.g.*, *Tichnell v. State*, 290 Md. 43, 55 (1981).

Substantively, however, federal courts prior to 1980 interpreted the Sixth Amendment to prohibit the use of documentary evidence in some instances where pre-1965 Maryland courts might have permitted it. For example, in *Kirby v. United States*, 174 U.S. 47 (1899), the defendant was charged with receiving goods that had been stolen from the United States. To prove that the goods Kirby allegedly received had been stolen from the United States Government, the government introduced records of the convictions of the persons who allegedly stole the goods. *Id.* at 49. At that time, the federal larceny statute made a thief's conviction conclusive evidence against the alleged receiver that federal property was stolen. *Id.* at 48. In *Kirby*, the Supreme Court held that this statute was

19

unconstitutional to the extent it permitted a record of conviction to establish a fact required

to be proved by witnesses:

> One of the fundamental guaranties of life and liberty is found in the sixth amendment of the constitution of the United States, which provides that 'in all criminal prosecutions the accused shall … be confronted with the witnesses against him.' Instead of confronting Kirby with witnesses to establish the vital fact that the property alleged to have been received by him had been stolen from the United States, he was confronted only with the record of another criminal prosecution, with which he had no connection, and the evidence in which was not given in his presence…. [A] fact which can be primarily established only by witnesses cannot be proved against an accused, charged with a different offense, for which he may be convicted without reference to the principal offender, except by witnesses who confront him at the trial, upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases.

*Id.* at 55; *see also Pointer*, 380 U.S. at 407 (finding a violation of the Sixth Amendment

right to confrontation where the State at Pointer's trial introduced a transcript of testimony

given at a preliminary hearing by a witness (Phillips), at which Pointer was present but

without counsel; "[b]ecause the transcript of Phillips' statement offered against [Pointer]

at his trial had not been taken at a time and under circumstances affording [Pointer] through

counsel an adequate opportunity to cross-examine Phillips, its introduction ... in a criminal

case ... amounted to denial of the privilege of confrontation guaranteed by the Sixth

Amendment."); *cf. California v. Green*, 399 U.S. 149, 161-62 (1970) (in holding that the

admission into evidence of a *testifying* witness's prior inconsistent statement did not violate

the Confrontation Clause of the Sixth Amendment, the Court observed that "[t]he concern

of most of our cases has been focused on precisely the opposite … situations where

statements have been admitted in the absence of the declarant and without any chance to

cross-examine him at trial. These situations have arisen through application of a number of traditional 'exceptions' to the hearsay rule, which permit the introduction of evidence despite the absence of the declarant usually on the theory that the evidence possesses other indicia of 'reliability' and is incapable of being admitted, despite good-faith efforts of the State, in any way that will secure confrontation with the declarant. Such exceptions, dispensing altogether with the literal right to 'confrontation' and cross-examination, have been subjected on several occasions to careful scrutiny by this Court.").

The incorporation of the federal Sixth Amendment jurisprudence into Maryland's consideration of alleged confrontation violations led Maryland courts after 1965 to take a more nuanced approach to such cases. For example, in *State v. Collins*, 265 Md. 70 (1972), this Court held that a deposition of a witness who died prior to trial was inadmissible because the defendant had been unaware of, and therefore was not present at, the deposition of the declarant. We explained that "[t]he prerogative of the defendant to have his accusers confront him is a keystone to our concept of criminal justice grounded on the unwavering belief that an individual should be afforded the opportunity to challenge the witnesses against him through cross-examination." *Id.* at 76. Although we recognized "that traditionally there are limited exceptions to the confrontation requirement," we explained that "these aberrations have only been permitted after close scrutiny has disclosed that this type of evidence is both necessary and so intrinsically reliable that it need not be subjected to the rigors of cross-examination. Likewise, the right of confrontation is generally not violated when the accused has been given a prior opportunity to cross-examine the witnesses whose testimony is to be used against him." *Id.* at 77-78 (footnote omitted).

21

And, in *Gregory*, a case involving a plea of not criminally responsible, the Court of Special Appeals held that the trial court violated the defendant's rights under the Sixth Amendment and Article 21 when it admitted hospital records containing the opinions of three psychiatrists that the defendant was sane at the time of the offense. 40 Md. App. at 324-28. In a comprehensive and thoughtful opinion authored by Judge Alan M. Wilner, the intermediate appellate court criticized dicta in another Court of Special Appeals opinion from two years earlier, *Jackson v. State*, 31 Md. App. 332, 343 (1976), in which the court had stated that a trial court "may, in a criminal trial, under appropriate circumstances, constitutionally dispense altogether with the literal right to confrontation and cross examination. One might view the confrontation clause and the hearsay exceptions as represented by circles, not quite concentric, but sharing a substantial area covered by both. When a question arises in the area covered by both, either rule alone provides sufficient protection to the rights of the accused." In *Gregory*, the Court of Special Appeals said of *Jackson*:

> We need not, and do not, retreat from the actual holding in *Jackson* that hearsay testimony of an "excited utterance" may be admissible in a criminal case. However, it does appear that such a broad statement, purporting to authorize a court to dispense altogether with the constitutional right of confrontation, and declaring, in effect, the confrontation clause to be no bar to the admission of any evidence otherwise admissible under some exception to the hearsay rule, is inconsistent with the controlling pronouncements of the Supreme Court, the Court of Appeals, and the federal appellate courts. We can no longer endorse such a conclusion.
>
> ….
>
> In reaching this conclusion, we need not consider the ultimate extent to which the right of confrontation applies to documents, as opposed to testimony; for, as the cases make clear, all documents are not alike. A

transcript of prior recorded testimony is a document, and, if properly authenticated, is admissible under one or more recognized exceptions to the hearsay rule; but it is not necessarily admissible under the confrontation clause. So it is with a hospital record. The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule, does not *ipso facto* make its admission comply with the confrontation requirement.

Under what we perceive to be the prevailing, and correct, view, we must look more closely at the disputed document itself. What evidence is contained in it? For what purpose is it offered? Does the statement in it relate directly and critically to the defendant's guilt or innocence, or does it pertain to collateral issues? Is the document primarily testimonial, or is it merely the recordation of a fact as easily and reliably proved by the document itself as by live testimony? If testimonial in nature, why is the author of the statements contained in it not in court? Is the information contained in it of a type that one may reasonably suppose its mere recordation in the ordinary course of business lends a sufficient reliability to it to be acceptable as trustworthy evidence? These, it would appear, are the relevant considerations.

We have here not the routine record of a person's birth, or death, or body temperature, not any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible. The document was offered without limitation as to purpose, and therefore for its truth. Thus, the jury was not merely advised of the fact that three staff psychiatrists had formed certain opinions; it was asked to accept as true – *i.e.,* to believe – the opinion of these three physicians that appellant was "sane" at the time he entered the bank.

This is critical evidence of a testimonial nature, pertaining directly to appellant's ultimate "guilt", that could, and should, have come *viva voce* – from the mouths of the witnesses in court, where, under the watchful eye of the jury, they could be cross-examined in the same manner as those physicians who did testify. There is nothing in the record to show that any of these three doctors were unavailable to appear in court; and we must assume that they did not appear simply because they were not summoned.

*Id.* at 324-26 (footnotes omitted).

All of this changed in 1980, when the Supreme Court decided *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Supreme Court held that, even when a hearsay declarant is not present for cross-examination at trial, the declarant's statement is admissible "if it bears adequate 'indicia of reliability'" which may be inferred when the evidence "falls within a firmly rooted hearsay exception" or with "a showing of particularized guarantees of trustworthiness." *Id.* at 66.

In effect, the Supreme Court's holding in *Roberts* validated the *Jackson* dicta that *Gregory* had criticized. Rather than breaking away from Supreme Court jurisprudence and retaining the *Gregory* Court's conception of the confrontation right by way of Article 21, Maryland appellate courts after *Roberts* applied *Roberts*'s more permissive Sixth Amendment standard in several cases prior to 2004, when the Supreme Court decided *Crawford v. Washington*. *See, e.g.*, *Moon*, 300 Md. 354; *Wildermuth v. State*, 310 Md. 496 (1987); *State v. Jones*, 311 Md. 23 (1987); *Chapman v. State*, 331 Md. 448 (1993); *Simmons v. State*, 333 Md. 547 (1994).

**C. *Crawford* and Its Aftermath**

As noted at the outset of this opinion, *Crawford v. Washington* involved a tape-recorded statement to police by a witness in which she described a stabbing. The defendant was the witness's husband. At his trial, the witness/wife was unavailable to testify as a result of Washington's marital privilege, which generally bars a spouse from testifying without the other spouse's consent. 541 U.S. at 40. Under Washington law, this privilege does not extend to a spouse's out-of-court statements admissible under a hearsay exception. In Crawford's trial, the State sought to introduce the wife's tape-recorded statement, which

she gave to officers at a police station shortly after the stabbing. The wife was given *Miranda* warnings prior to making her statement. At trial, the prosecution argued that the statement was admissible as a statement against the wife's penal interest. *Id.* Over Crawford's objection based on the Confrontation Clause, the trial court admitted the wife's statement to police, and the prosecution relied on it in closing, arguing that it was "damning evidence" that "completely refutes [Crawford's] claim of self-defense." *Id.* at 40-41. The jury convicted Crawford of assault.

After the case made its way to the Supreme Court, the Court overruled *Roberts* and held that the admission of the wife's statement to police violated Crawford's right to confrontation under the Sixth Amendment. After examining the historical background of the Confrontation Clause, the Court stated that its "primary object" is "testimonial hearsay." *Id.* at 53. The Confrontation Clause demands that an absent witness's out-of-court testimonial hearsay statement be inadmissible, unless "the [witness] is unavailable[] and … the defendant has had a prior opportunity to cross-examine." *Id.* at 59.

To illustrate what types of formal statements may be classified as testimonial, the Court offered the following "formulations" of the "core class" of testimonial statements:

> *ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; ... extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; ... [and] statements that were made under

circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (cleaned up). The Court stated that "[t]hese formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it." *Id.* at 52. However, the Court declined to provide a "comprehensive definition of 'testimonial.'" *Id.* at 68.

Two years later, in *Davis v. Washington*, the Court decided two cases involving statements made by alleged victims of domestic abuse to law enforcement, which prosecutors subsequently admitted at trial without the victims present for cross-examination. 547 U.S. 813. Justice Scalia wrote the majority opinion, as he had in *Crawford*. In one case, *Davis v. Washington*, the Court held that a tape-recorded statement by a woman to a 911 operator that her former boyfriend was in the process of assaulting her was not testimonial. In that case, the victim's "primary purpose" in placing the 911 call "was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying*. What she said was not a weaker substitute for live testimony at trial[.]" *Id.* at 828 (internal quotation marks and citation omitted).

In the companion case, *Hammon v. Indiana*, the Majority held that the alleged victim's statement to a police officer during the officer's investigation of the incident was testimonial. In the Majority's view, the victim's statements

> were not much different from the statements we found to be testimonial in *Crawford*. It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct… There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything…. When the officer … elicited the challenged statements, he was not seeking to

determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime[.]

*Id.* at 829-30.

The Majority summarized its resolution of the two cases as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

Justice Thomas concurred in the judgment in *Davis* and dissented in *Hammon*. He opined that, in *Crawford*, the Court had required "some degree of solemnity before a statement can be deemed 'testimonial.'" *Id.* at 836 (Thomas, J., concurring in part and dissenting in part). In Justice Thomas's view, "statements regulated by the Confrontation Clause must include extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* (cleaned up).

On this point, the Majority stated:

It is true that the *Crawford* interrogation was more formal. It followed a *Miranda* warning, was tape-recorded, and took place at the station house, *see* 541 U.S., at 53, n. 4, 124 S.Ct. 1354. While these features certainly strengthened the statements' testimonial aspect—made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events—none was essential to the point…. What we called the "striking resemblance" of the *Crawford* statement to civil-law *ex parte* examinations, 541 U.S., at 52, 124 S.Ct. 1354, is shared by [the victim's] statement here…. Both statements deliberately recounted, in

27

response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial."

*Id.* at 830. Notably, *Davis* was an 8-1 decision. Chief Justice Roberts, Justice Kennedy, Justice Breyer, and Justice Alito – who would constitute a separate bloc in three subsequent cases discussed below – joined the majority opinion.

In the years that have passed since the Court decided *Crawford* and *Davis*, the Supreme Court and other courts around the country have grappled with the meaning of "testimonial" in the context of scientific evidence. The eight-Justice majority in *Davis* splintered into two groups of four in these cases, leading to confusion in this Court and many others. We now turn to the pertinent scientific evidence cases of the Supreme Court and this Court in their chronological order: *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Derr v. State*, 422 Md. 211 (2011) ("*Derr I*"); *Williams v. Illinois*, 567 U.S. 50 (2012); *Derr v. State*, 434 Md. 88 (2013) ("*Derr II*"); *Cooper v. State*, 434 Md. 209 (2013); and *State v. Norton*, 443 Md. 517 (2015). We also note the Supreme Court's decision not to grant *certiorari* in another such case, *Stuart v. Alabama*, 139 S. Ct. 36 (2018).

    1. *Melendez-Diaz* and *Bullcoming*

In *Melendez-Diaz v. Massachusetts*, the Supreme Court held that the forensic reports at issue in that case fell within the "core class of testimonial statements" outlined in *Crawford*. 557 U.S. at 310. In that case, Melendez-Diaz had been charged with distributing and trafficking cocaine. *Id.* at 308. At trial, the court admitted into evidence "certificates

of analysis," the results of which stated that the substance seized from Melendez-Diaz contained cocaine. *Id.* The certificates were sworn to by the analysts before a notary public, in accordance with the applicable Massachusetts statute. *Id.* The analysts who prepared the certificates were absent from the trial. *Id.*

Writing for a five-person Majority, Justice Scalia concluded that the certificates were admitted in violation of the Confrontation Clause for reasons related to their form and intended use. The certificates were affidavits, *i.e.*, "declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths." *Id.* at 310 (quoting Black's Law Dictionary 62 (8th ed. 2004)). The certificates were also "solemn" declarations "made for the purpose of establishing or proving some fact": that the substance found in Melendez-Diaz's possession was cocaine. *Id.* Furthermore, the Court concluded that, because "the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance" and because that purpose was stated on the certificates, the analysts must have been aware of the certificates' purpose. *Id.* at 311. Therefore, the Court held that the certificates were testimonial, and that the analysts who executed them were witnesses whom Melendez-Diaz was entitled to confront and cross-examine at trial. *Id.* at 311, 329.

Justice Thomas once again wrote separately to express his view that "the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 329 (Thomas, J., concurring) (internal quotation marks and citations omitted). He explained that he joined the majority opinion because the

certificates "at issue in the case 'are quite plainly affidavits'" and, "[a]s such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause." *Id.* at 330 (quoting the majority opinion, *id.* at 310).

Justice Kennedy wrote a dissenting opinion, joined by Chief Justice Roberts, Justice Breyer, and Justice Alito. Among other points, the dissenters criticized the majority for failing to "acknowledge the real differences between laboratory analysts who perform scientific tests and other, more conventional witnesses." *Id.* at 330 (Kennedy, J., dissenting).

Two years later, the Court decided *Bullcoming v. New Mexico*. There, the Court considered whether a prosecutor may introduce a forensic laboratory report through the in-court testimony of an expert who neither signed the report nor performed or observed the analysis. 564 U.S. 647. Bullcoming was arrested for driving while intoxicated (DWI) and was convicted of aggravated DWI. *Id.* at 651. The sole evidence used to support his prosecution for aggravated DWI was a forensic laboratory report that certified his blood-alcohol concentration was above the threshold for that offense. *Id.*

At Bullcoming's trial, the prosecution presented a "certificate of analyst," which was signed by a forensic analyst assigned to test Bullcoming's blood sample. *Id.* at 653. The State did not call the certifying analyst to provide in-court testimony. *Id.* at 655. Instead, the prosecution called an expert who was familiar with the process and procedures involved in the analysis, and sought to introduce the report as a business record. *Id.* Writing for the five-Justice majority, Justice Ginsburg explained that, under *Crawford* and *Melendez-Diaz*, Bullcoming had a right to confront the witness who prepared the report,

and that the introduction of the report through "surrogate testimony" of an expert who neither signed the report nor performed or observed the test reported in it, does not pass constitutional muster. *Id.* at 652. The Court emphasized that, although the blood-alcohol concentration report was unsworn, whereas the certificates in *Melendez-Diaz* were sworn, that was a distinction without a difference for constitutional purposes. *See id.* at 664-65.

Justice Thomas joined most of the majority opinion, but significantly, not footnote 6, which quoted the operative language from *Davis* concerning what made the statements in those cases testimonial (or not testimonial): "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *Id.* at 659 n.6 (quoting *Davis*, 547 U.S. at 822) (alterations in original). Thus, there were not five votes to apply *Davis*'s "primary purpose" standard in the context of a scientific report. The same four Justices who dissented in *Melendez-Diaz* again dissented in *Bullcoming*. *See id.* at 674 (Kennedy, J., dissenting).

2. This Court's Decision in *Derr I*

Three months after the Supreme Court decided *Bullcoming*, this Court issued its opinion in *Derr I*. In a unanimous decision, the Court relied on *Bullcoming* and held that "the trial judge erred in admitting the results of scientific testing through a surrogate analyst who did not … perform or observe the actual testing." 422 Md. at 253. At Derr's trial, the State called an expert who supervised the work of the analysts on her team and reached

31

conclusions after reviewing their work and the work of analysts whom she did not supervise. *Id.* at 245-46. We summarized our analysis as follows:

> In the case of DNA testing, the DNA profile is a statement of the analyst that essentially says: "This is the DNA profile for this person." If the DNA profile is inputted into CODIS and a match is obtained, then that match is derived from the statement of the analyst. In light of *Bullcoming* and *Melendez,* it is inescapable that the testing procedures and method employed, the DNA profile created, and the conclusion that there is a match are testimonial in nature, and therefore the analyst who performed the DNA testing or the supervisor who observed the analyst perform the DNA testing must testify in order to satisfy the Confrontation Clause, unless the witness is unavailable and the defense had a prior opportunity to cross-examine the witness. *See Bullcoming,* 564 U.S. at 657-65, 131 S.Ct. at 2713–17, 180 L.Ed.2d at 619–24.
>
> We reach this conclusion for several reasons. First, the DNA profile and report are made for the primary purpose of establishing facts relevant to a later prosecution, and an objective analyst would understand that the statements will be used in a later trial. Stated differently, the analyst who generated the report must have known that the purpose of the testing was ultimately to establish the perpetrator's identity through DNA evidence. Second, the testing results, and the resulting DNA profile, can be considered an affidavit because they are the functional equivalent of in-court testimony, offered to establish *prima facie* evidence of guilt, which constitutes formalized testimonial material. Third, the statements produced by DNA testing are testimony under *Crawford* because the statements are solemn declarations made to prove a fact, namely the identification of the sample and possible match. Finally, the analyst who performs the DNA analysis is a witness for the purpose of the Confrontation Clause because the DNA profile created is a representation "relating to past events and human actions not revealed in raw, machine-produced data[.]" *Bullcoming,* 564 U.S. at 660, 131 S.Ct. at 2714, 180 L.Ed.2d at 621. Therefore, the DNA profiles created by lab analysts, the reports they produce, and the conclusions or opinions they form contain testimonial statements that are subject to the requirements of the Confrontation Clause.

*Id.* at 236-38 (cleaned up).

3. The Supreme Court's Fractured Decision in *Williams v. Illinois*

The Supreme Court's last substantive decision concerning the Confrontation Clause in the context of forensic evidence was *Williams v. Illinois* in 2012. In that case, Williams was tried before a judge and convicted of crimes related to a sexual offense. 567 U.S. at 59-60. In the course of the investigation, analysts at a private laboratory, Cellmark Diagnostics, generated a DNA profile from genetic material contained on vaginal swabs taken from the victim (the "Cellmark profile"). Their findings were presented in a document titled "Report of Laboratory Examination" (the "Cellmark report"). The Cellmark report listed both Cellmark's "case" number and the "Agency Case No." and stated:

> DNA testing using the Polymerase Chain Reaction (PCR) and the AmpFISTR Profiler Plus™ and the AmpFISTR COfiler™ Amplification Kits was performed on the indicated exhibits. The loci tested and the results obtained for each tested sample are listed in Table 1. Additional information regarding possible male contributor(s) is listed in Table 2.

> The DNA obtained from the epithelial cell fraction of the vaginal swab is from a female and matches the profile for [the victim].

> The DNA obtained from the sperm fraction of the vaginal swab is a mixture from a male and female. Types present in the mixture are consistent with the types obtained from [the victim]. Assuming that the mixture contains DNA from only two sources and [the victim] is one of the sources, the possible types of male donor are listed in Table 2.

> ….

> In the absence of specific instruction, evidence will be returned to the submitting agency[.]

Table 2 of the Cellmark report set forth the DNA profile of the "Deduced Male Donor" taken from one of the victim's vaginal swabs. The report was signed by two "reviewers,"

33

who were listed, respectively, as the "Laboratory Director[s]" of Cellmark's "Forensic Laboratory" and "Identity Laboratory."[17]

At trial, the prosecution did not call either of the Cellmark reviewers as a witness. Rather, the prosecution presented the testimony of three other forensic scientists: (1) one who tested the vaginal swabs collected from the victim and confirmed the presence of semen on them; (2) one who developed a DNA profile from Williams's reference sample and entered it into a database; and (3) one who compared the Cellmark profile to Williams's DNA profile and testified that the two profiles matched. *See id.* at 60-62. The Cellmark report was neither admitted into evidence nor shown to the trial judge, *id.* at 62, who found Williams guilty.

On appeal, Williams argued that the trial court violated his right to confrontation by permitting the third expert to testify about the results of the Cellmark report that she had had no role in creating. *Id.* at 61. The question presented for the Supreme Court's review was "[w]hether a state rule of evidence allowing an expert witness to testify about the results of DNA testing performed by non-testifying analysts, where the defendant has no opportunity to confront the actual analysts, violates the Confrontation Clause." Petition for Writ of Certiorari at i, *Williams v. Illinois*, 567 U.S. 50 (2012) (No. 10-8505), 2010 WL 6817830. In an opinion written by Justice Alito, a four-Justice plurality – comprised of the dissenters in *Melendez-Diaz* and *Bullcoming* – answered that question in the negative. First,

---

[17] A copy of the Cellmark report was reproduced as Appendix C to this Court's opinion in *State v. Norton*, 443 Md. 517 (2015).

34

according to the plurality, the expert who testified about the match between the Cellmark profile and Williams's reference sample was permitted to testify because her testimony about the Cellmark profile was not "offered to prove the truth of the matter asserted," 567 U.S. at 57-58 (plurality op.), and therefore did not convey any hearsay to the trier of fact. Rather, the expert's statements about the results contained in the Cellmark report were permissible under the applicable rules of evidence because they explained the expert's basis for reaching her conclusions. *Id.* at 77-78. Second, according to the plurality, even if the Cellmark report had been admitted into evidence, its admission would not have violated the Confrontation Clause because the report was not prepared for the purpose of accusing Williams, "who was neither in custody nor under suspicion" when the report was created. *Id.* at 84. In other words, because the report was produced before Williams was a suspect, the report was not "accusatory" and, therefore, unlike the reports at issue in *Melendez-Diaz* and *Bullcoming*, not testimonial. *Id.* at 82-83.

Justice Breyer joined the plurality opinion but also wrote a concurring opinion in which, among other points, he expressed a practical concern about forsaking the previously common approach of permitting scientific experts to rely on the findings of other scientists when providing their expert opinions, without requiring the prosecution also to call the other scientists as witnesses. According to Justice Breyer, "[o]nce one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call *all* of the laboratory experts who did so." *Id.* at 89 (Breyer, J., concurring).

Justice Thomas wrote a concurring opinion for himself only, and Justice Kagan wrote a dissenting opinion, which was joined by Justices Scalia, Ginsburg, and Sotomayor. All five of these Justices rejected the plurality opinion in its entirety. With respect to whether the Cellmark report was hearsay, Justice Thomas opined that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose" and that "[t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." *Id.* at 106 (Thomas, J., concurring). Justice Thomas also disagreed with the plurality's "testimonial" test that analyzed whether the statement in question is "accusatory." According to Justice Thomas, "[t]here is no textual justification … for limiting the confrontation right to statements made after the accused's identity became known." *Id.* at 114.

However, Justice Thomas concurred in the plurality's judgment because, in his view, the Cellmark report "lacked the requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause." *Id.* at 103 (cleaned up). According to Justice Thomas, for a declarant's extrajudicial statement "to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution" *and* the statement must "bear[] the formality and solemnity necessary to come within the scope

36

of the Clause." *Id.* at 114. With respect to the report at issue in *Williams*, Justice Thomas concluded:

> The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. The report is signed by two "reviewers," but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation.

*Id.* at 111 (cleaned up). In contrast to the blood-alcohol concentration report at issue in *Bullcoming*, Justice Thomas opined that the Cellmark report "certifie[d] nothing." *Id.* at 112.

In her dissenting opinion, Justice Kagan agreed with Justice Thomas's critique of the plurality opinion. *See id.* at 125-38 (Kagan, J., dissenting). With respect to the plurality's "accusatory" test, Justice Kagan observed that such a requirement "has no basis in our precedents," *id.* at 135, and quoted *Davis*'s standard: "We have previously asked whether a statement was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence." *Id.* (quoting *Davis*, 547 U.S. at 822).

Responding to the plurality's contention that scientific reports, such as the Cellmark report are inherently reliable, Justice Kagan wrote:

> Been there, done that. In *Melendez–Diaz*, this Court rejected identical arguments, noting extensive documentation of "[s]erious deficiencies ... in the forensic evidence used in criminal trials." 557 U.S., at 319; *see also Bullcoming*, 131 S.Ct., at 2711, n.1 (citing similar errors in laboratory analysis).... Scientific testing is "technical," to be sure, … but it is only as reliable as the people who perform it. That is why a defendant may wish to

ask the analyst a variety of questions: How much experience do you have? Have you ever made mistakes in the past? Did you test the right sample? Use the right procedures? Contaminate the sample in any way? Indeed, as scientific evidence plays a larger and larger role in criminal prosecutions, those inquiries will often be the most important in the case.

And *Melendez–Diaz* made yet a more fundamental point in response to claims of the *über alles* reliability of scientific evidence: It is not up to us to decide, *ex ante*, what evidence is trustworthy and what is not. *See* 557 U.S., at 317–318, 129 S.Ct. 2527; *see also Bullcoming*, 564 U.S., at ——, 131 S.Ct., at 2714–2715. That is because the Confrontation Clause prescribes its own "procedure for determining the reliability of testimony in criminal trials." *Crawford*, 541 U.S., at 67, 124 S.Ct. 1354. That procedure is cross-examination. And "[d]ispensing with [it] because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Id.*, at 62, 124 S.Ct. 1354.

…. The plurality can find no reason consistent with our precedents for treating the Cellmark report as nontestimonial. That is because the report is, in every conceivable respect, a statement meant to serve as evidence in a potential criminal trial. And that simple fact should be sufficient to resolve the question.

*Id.* at 137-38.

Justice Kagan also disagreed with Justice Thomas's insistence that an extrajudicial statement can only be testimonial if it is "formal" or "solemn":

Justice THOMAS's approach grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections.

To see the point, start with precedent, because the Court rejected this same kind of argument, as applied to this same kind of document, at around this same time just last year. In *Bullcoming*, the State asserted that the forensic report at issue was nontestimonial because—unlike the report in *Melendez–Diaz*—it was not sworn before a notary public. We responded that applying the Confrontation Clause only to a sworn forensic report "would make the right to confrontation easily erasable"—next time, the laboratory could file the selfsame report without the oath. 564 U.S., at ——, 131 S.Ct., at 2717. We then held, as noted earlier, that "[i]n all material respects," the forensic report in *Bullcoming* matched the one in *Melendez–Diaz*. 564 U.S., at ——, 131 S.Ct., at 2717*; see supra*, at 2266. First, a law enforcement

38

officer provided evidence to a state laboratory assisting in police investigations. *See* 564 U.S., at ——, 131 S.Ct., at 2717. Second, the analyst tested the evidence and "prepared a certificate concerning the result[s]." *Ibid.* Third, the certificate was "formalized in a signed document ... headed a 'report.'" *Ibid.* (some internal quotation marks omitted). That was enough.

Now compare that checklist of "material" features to the report in this case. The only differences are that Cellmark is a private laboratory under contract with the State (which no one thinks relevant), and that the report is not labeled a "certificate." That amounts to (maybe) a nickel's worth of difference: The similarities in form, function, and purpose dwarf the distinctions. *See supra*, at 2266 – 2267. Each report is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings. Neither looks any more "formal" than the other; neither is any more formal than the other. *See ibid.* The variances are no more (probably less) than would be found if you compared different law schools' transcripts or different companies' cash flow statements or different States' birth certificates. The difference in labeling—a "certificate" in one case, a "report of laboratory examination" in the other—is not of constitutional dimension.

Indeed, Justice THOMAS's approach, if accepted, would turn the Confrontation Clause into a constitutional geegaw—nice for show, but of little value. The prosecution could avoid its demands by using the right kind of forms with the right kind of language. (It would not take long to devise the magic words and rules—principally, never call anything a "certificate.") And still worse: The new conventions, precisely by making out-of-court statements less "solem[n]," *ante*, at 2255 – 2256, would also make them less reliable—and so turn the Confrontation Clause upside down.

*Id.* at 139-40.

4. This Court's Post-*Williams* Cases: *Derr II*, *Cooper*, and *Norton*

After *Williams* was decided, the Supreme Court vacated this Court's judgment in *Derr I* and remanded the case for further consideration. *Maryland v. Derr*, 567 U.S. 948 (2012). On remand, we reversed our holding. *Derr II*, 434 Md. 88. Under *Marks v. United States*, 430 U.S. 188 (1977), the Majority in *Derr II* discerned Justice Thomas's concurring opinion – and its requirement that an extrajudicial statement be formal in order for the

statement to be testimonial – as the narrowest holding in *Williams*. *Derr II*, 434 Md. at 114. The Majority therefore stated that "forensic evidence must be at least formalized to be testimonial." *Id.* at 118.

Accordingly, we separately assessed each of the three reports that the court admitted into evidence at Derr's trial for indicia of formality, and concluded that, under Justice Thomas's analysis, the reports were not sufficiently formal to qualify as testimonial. The serological information appeared to be unsigned notes from the bench work of the serological examiner, which did not contain anything certifying their accuracy. *See id.* at 118-19. Similarly, the 2002 DNA test results were comprised of "a series of numbers and lines, and on the bottom of the documents [were] the initials of two parties," *id.* at 119, as were the results of the 2004 DNA test. *See id.* at 120. Because nothing in the 2002 or 2004 test results attested to their accuracy, the Court concluded that Justice Thomas would hold those test results not to be formal or solemn and, therefore, not testimonial. *See id.* at 119-20.

The *Derr II* Majority noted that, in past cases, the Court had read Article 21 and the Sixth Amendment "*in pari materia*, or as generally providing the same protection to defendants." *Id.* at 103. The Majority stated that "Derr has failed to persuade this Court to deviate from that practice," and therefore rejected Derr's argument that the Court should arrive at a different result by interpreting Article 21 differently than Justice Thomas had done in *Williams*. *Id.*[18]

---

[18] *Craig v. State* is where the term "*in pari materia*" was first invoked to reject an argument that this Court should interpret Article 21 differently than the Supreme Court has

40

In dissent, Judge John C. Eldridge, joined by Chief Judge Robert Bell, criticized the Majority's application of *Marks* and advocated that the Court take a different approach to confrontation in the context of scientific evidence:

> If Justice Thomas's opinion in *Williams* did represent the holding of the Court, it is difficult to understand why no member of the plurality joined the Thomas opinion, or why Justice Thomas did not join a portion of the plurality opinion.
>
> .…
>
> The majority today, based solely on one Justice's lone opinion, overturns this Court's *unanimous* 2011 decision in the present case which had granted Mr. Derr a new trial. Consequently, unless and until the Supreme Court clarifies the application of the Sixth Amendment's Confrontation Clause to evidence of the type involved in this case, Justice Thomas's opinion in *Williams* will control the application in Maryland courts of the Federal Constitution's right of confrontation. Moreover, under the majority opinion today, Justice Thomas's *Williams* opinion apparently will control the application of the Confrontation Clauses in Article 21 of the Maryland Declaration of Rights. I cannot agree with such a result.

*Id.* at 141-42 (Eldridge, J., dissenting). Judge Eldridge further noted that, "[i]n many cases presenting claims that constitutional rights were violated, involving both a provision of the Maryland Constitution and a counterpart provision of the Federal Constitution, this Court's opinions have separately addressed the Maryland constitutional provision. In those cases, upon deciding that a violation of the Maryland Constitution did occur, we have either not reached the Federal constitutional issue or have made it clear that our decision under the Maryland Constitution was independent of our views under the counterpart provision of

---

interpreted the Sixth Amendment. 322 Md. 418, 430 (1991) ("The two Confrontation Clauses are *in pari materia*.") (citing *Moon*, 300 Md. at 359; *Crawford*, 282 Md. at 211; *Collins*, 265 Md. at 75).

the Federal Constitution." *Id.* at 143. Indeed, in Judge Eldridge's view, "as Maryland's highest Court, we should be expected to first address a provision of the Maryland Constitution rather than a counterpart provision of the Federal Constitution." *Id.* at 144. Nevertheless, Judge Eldridge continued, "if some reason or explanation were needed or appropriate, the failure of the Supreme Court to render an opinion in *Williams v. Illinois* would clearly justify basing our decision on Article 21 of the Declaration of Rights and not reaching the Sixth Amendment issue." *Id.* Judge Eldridge explained that there was ample precedent for this Court to interpret a provision in Maryland's Constitution more broadly than the Supreme Court had interpreted a similarly worded Federal constitutional provision. *See id.* at 146-48 (providing examples). Judge Eldridge would have reinstated the Court's prior judgment in *Derr I* insofar as it was alternatively grounded on Article 21. *Id.* at 149.

A few days after *Derr II* came our decision in *Cooper v. State*. In that case, Cooper was convicted of multiple sexual offenses; the forensic evidence that linked him to the victim was DNA found on a napkin. 434 Md. at 213-14. The trial court admitted a forensic analysis report through the testimony of an expert who supervised the analyst who had prepared that report. *Id.* at 219, 221. Specifically, the author of the report (Shields) generated two DNA profiles, one of which came from the napkin. *See id.* at 217. The expert who testified at trial had reviewed Shields's report as its technical reviewer. *Id.* at 221. She testified that she reviewed Shields's report for accuracy and concurred with its results. *Id.*

at 231. This Court concluded that the report was admissible under Maryland Rule 5-703[19] as the basis for the testifying expert's opinion. *Id.* at 230. As for Cooper's confrontation argument, we concluded that the report was nontestimonial because it lacked formality:

> The Shields report … is a two page document indicating, among other things, when the report was created, what items were tested, what procedures were used to develop the results, and the DNA results developed from the testing. Nowhere on either page of the report, however, is there an indication that the results are sworn to or certified or that any person attests to the accuracy of the results. Although [the laboratory] developed the results at the request of the Baltimore City Police Department, the Shields report is not the result of any formalized police interrogation. Therefore, applying Justice Thomas's reasoning we conclude that the Shields report lacks the formality to be testimonial.

*Id.* at 236. Thus, we held that the introduction of Shields's report was proper and did not violate the Maryland Rules or Cooper's federal and state constitutional rights.[20] *Id.* at 245.

Our most recent decision in this area is *State v. Norton*. In that case, an analyst prepared a "Forensic DNA Case Report" that included DNA profiles obtained from a cutting of a ski mask worn by the assailant in a robbery, and from a buccal swab from

---

[19] At the time, Rule 5-703(a) provided: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." This Rule was amended in 2019, but still permits an expert to base on opinion or an inference on facts or data that were "perceived or made known to the expert at or before the hearing," and if such facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Md. Rule 5-703(a).

[20] Like Derr, Cooper urged this Court to consider his state constitutional rights independently. 434 Md. at 213. We declined to do so, stating that Cooper had "failed to persuade us to deviate from reading the two rights *in pari materia* in the present case." *Id.* at 233.

Norton, who was a suspect in the robbery. 443 Md. at 521. The report stated that "[t]he DNA profiles reported in this case were determined by procedures that have been validated according to standards established by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and adopted as Federal Standards." *Id.* On the second page of the report, above her signature, the analyst stated that, "within a reasonable degree of scientific certainty," Norton was the "major source of the biological material obtained from" the ski mask. *Id.*

At Norton's trial, the State did not call the analyst who prepared the report. Instead, the analyst's supervisor testified. During the supervisor's testimony, the State admitted the analyst's report into evidence over Norton's objection on confrontation grounds. *Id.* Norton was convicted of the robbery.

When the case came before this Court, we first refined our holding in *Derr II* concerning how circuit courts should analyze Sixth Amendment confrontation challenges to scientific evidence. After discussing the relevant caselaw from *Crawford* through *Derr II*, we noted that, "[s]ince *Derr II* was decided, many other courts also have struggled to interpret *Williams* and apply its tenets." *Id.* at 542. We observed that those other courts had ascribed "[t]he essence of the confusion" to the fact that "none of the opinions in *Williams* articulated what could be described as the 'narrowest' ground for the opinion, nor did the plurality and concurring opinions provide overlapping rationales." *Id*. However, we found it "noteworthy" that none of those other courts had adopted the same approach as *Derr II* and solely relied upon Justice Thomas's concurrence. *Id.* at 545. "In light of what [had]

44

transpired since *Williams* and *Derr II*" in those other courts, we opted to "better refine our

own analysis" from *Derr II*. *Id.* at 545-46.

Although we noted that other appellate courts "have declined to apply *Williams* and

have retreated, instead, to *Melendez–Diaz* and *Bullcoming*," *id.* at 544-45 (citing

*Commonwealth v. Yohe*, 79 A.3d 520 (Pa. 2013), *State v. Michaels*, 95 A.3d 648 (N.J.

2014), and *United States v. Duron-Caldera*, 737 F.3d 988, 994 (5th Cir. 2013)), we chose

to adopt the approach taken by the District of Columbia Court of Appeals in *Young v.

United States*, 63 A.3d 1033 (D.C. 2013). The *Young* Court observed that "a statement

could be accusatory and, therefore, be testimonial under Justice Alito's test, but without

being formal enough to satisfy Justice Thomas's test," while, conversely, a statement

"could be formal under Justice Thomas's test … but without accusing or targeting a

particular suspect and, therefore, not be testimonial under Justice Alito's opinion." *Id.* at

543 (citing *Young*, 63 A.3d at 1043). That being the case, the *Young* Court took a different

approach than this Court did in *Derr II*:

> By analogy to *Marks*, it can be argued that while Justice Alito's rationale and
> Justice Thomas's rationale may not be includible *within each other*, the
> different tests they utilize to determine whether a statement is testimonial are
> subsumed within and narrower than *the dissenters'* test. That is so because
> Justice Alito and Justice Thomas each added an additional requirement to the
> basic "evidentiary purpose" test espoused by Justice Kagan. If the four-
> Justice plurality would deem a statement testimonial under the targeted
> accusation test, the four dissenting Justices surely would deem it testimonial
> under the broader evidentiary purpose test. Similarly, if Justice Thomas
> would deem a statement testimonial employing his formality criterion along
> with the evidentiary purpose test, the four dissenting Justices necessarily
> would deem it testimonial using the evidentiary purpose test alone. It
> therefore is logically coherent and faithful to the Justices' expressed views
> to understand *Williams* as establishing—at a minimum—a sufficient, if not a
> necessary, criterion: a statement is testimonial at least when it passes the

> basic evidentiary purpose test plus *either* the plurality's targeted accusation requirement *or* Justice Thomas's formality criterion. Otherwise put, if *Williams* does have precedential value as the government contends, an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

*Young*, 63 A.3d at 1043-44 (quoted in *Norton*, 443 Md. at 543-44).

In *Norton*, we determined, based on *Young*'s analysis, that "an approach to *Williams* can be constructed by formulating a test that, if satisfied, would result in adherence to the opinions of a majority of the Justices." *Id.* at 546. Thus, we instructed Maryland courts, "when reviewing the admissibility of forensic documents under the Confrontation Clause, to consider first, whether the report in issue is formal, as analyzed by Justice Thomas; or, if not, whether it is accusatory, in that it targets an individual as having engaged in criminal conduct, under Justice Alito's rationale." *Id.* at 547 (citations omitted).

Applying that approach to the facts in *Norton*, we held that the Forensic DNA Case Report was testimonial. First, as to formality, we noted that the Report "contains a certification in the phrase 'within a reasonable degree of scientific certainty'. The inclusion of such language … in a DNA report identifying a match between a defendant's profile with that of a perpetrator is key to the acceptance of the expert's testimony into evidence in Maryland." *Id.* at 548. Without this language certifying the result, we held, "the testimony is without foundation." *Id.* We continued:

> The Report in issue, thus, is testimonial pursuant to Justice Thomas's concurring opinion in *Williams*, because it was certified and was signed by the analyst who had performed the test, indicating that the analyst's results had been validated according to federal standards, even if unsworn. It may not be within the "core class" of sworn documents, such as affidavits, to which Justice Scalia referred in *Crawford*, 541 U.S. at 51–52, 124 S.Ct. at

1364, 158 L.Ed.2d at 193, but it does come within "formalized testimonial materials" to which Justice Thomas made reference and gave non-exclusive examples.

*Id.* at 549. Although the formality of the report settled the question of whether it was testimonial, we went on to explain that the report also was testimonial under Justice Alito's "accusatory" test, because it stated that Norton was "the major source of the biological material obtained from [the] evidence." *Id.* (alteration in original).

Because the report at issue in Norton's case was testimonial under either Justice Thomas's or Justice Alito's test set forth in their respective opinions in *Williams*, we held that the trial court erred in admitting it at Norton's trial. *See id.* at 553.

5.  The Denial of Certiorari in *Stuart v. Alabama*

We also note that, in 2018, the Supreme Court denied a petition for *certiorari* in another case involving a confrontation challenge to scientific evidence. *Stuart v. Alabama*, 139 S. Ct. 36. Justice Gorsuch, joined by Justice Sotomayor, dissented from the denial of *certiorari*. That case involved a charge of driving under the influence of alcohol. The State introduced into evidence the results of a blood-alcohol test conducted hours after the defendant's arrest without calling as a witness the analyst who performed the test. *Id.* A different analyst testified at Stuart's trial. *Id.* Using the results of the post-arrest blood-alcohol test, the testifying expert estimated the defendant's blood-alcohol level hours earlier when she was driving. *Id.* According to Justice Gorsuch, "[t]hrough these steps, the State effectively denied Ms. Stuart the chance to confront the witness who supplied a foundational piece of evidence in her conviction," violating the Sixth Amendment. *Id.* Justice Gorsuch commented that the "Court's most recent foray in this field, *Williams v.*

47

*Illinois*, yielded no majority and its various opinions have sown confusion in courts across the country." *Id.* Justice Gorsuch would have granted review in the case to provide clarity for courts attempting to apply the Court's Sixth Amendment confrontation jurisprudence: "Respectfully, I believe we owe lower courts struggling to abide our holdings more clarity than we have afforded them in this area. *Williams* imposes on courts with crowded dockets the job of trying to distill holdings on two separate and important issues from four competing opinions. The errors here may be manifest, but they are understandable and they affect courts across the country in cases that regularly recur." *Id.* at 37.

6. Resolution of This Case

Leidig asserts that the trial court violated his confrontation rights under the Sixth Amendment and Article 21 by admitting Ms. Rollo's report into evidence and further by allowing Ms. Keener to convey Ms. Rollo's results and conclusions to the jury, all without subjecting Ms. Rollo to cross-examination. With respect to the Sixth Amendment analysis, although Leidig acknowledges that Ms. Rollo's report is not "accusatory" within the meaning of Justice Alito's plurality opinion in *Williams*, he argues that Ms. Rollo's report "is replete with indicia of formality" and is therefore testimonial under Justice Thomas's concurring opinion. To the extent Ms. Rollo's report is not testimonial within the meaning of the Sixth Amendment, Leidig contends that we should adopt a different standard under Article 21 and hold that the admission of Ms. Rollo's report violated Article 21.

The State responds that, under Justice Thomas's opinion in *Williams*, Ms. Rollo's report is not testimonial. In addition, the State asserts that Ms. Keener's status as a "peer reviewer" of Ms. Rollo's report takes Ms. Keener out of the realm of providing "pure

surrogate testimony," as disapproved in *Bullcoming*. In addition, the State invokes Maryland Rule 5-703 to sustain the admission of Ms. Rollo's report and Ms. Keener's testimony about it as basis evidence necessary for the jury to understand Ms. Keener's expert testimony. The State further argues that we should continue to read Article 21 as providing the same protection to a criminal defendant as the Supreme Court has identified as inhering in the Sixth Amendment.

As discussed below, the Sixth Amendment issue in this case turns on whether Ms. Rollo's report is sufficiently "formal" under Justice Thomas's concurring opinion in *Williams* to qualify as testimonial. The answer to that question is unclear. Assuming without deciding that Justice Thomas would hold that Ms. Rollo's report is *not* formal and therefore is not "testimonial" for purposes of a Sixth Amendment confrontation analysis, we conclude it is necessary and appropriate to adopt our own standard under Article 21 of what makes a scientific report "testimonial" – one that does not, in some cases, turn on whether an out-of-court statement is "formal" or "solemn."

###### a. *Sixth Amendment Analysis*

Applying the framework we adopted in *Norton*, we perceive that the Sixth Amendment analysis narrows to a single question: is Ms. Rollo's report "formal" within the meaning of Justice Thomas's concurring opinion in *Williams*? If the answer to that question is "no," then, as Leidig acknowledges, Ms. Rollo's report is not "testimonial" under the Sixth Amendment because it is not "accusatory" within the meaning of Justice Alito's plurality opinion in *Williams*. If Ms. Rollo's report is not testimonial, then there was no Sixth Amendment violation at Leidig's trial. Thus, we attempt to determine whether

49

Ms. Rollo's report is sufficiently formal to be testimonial under the Sixth Amendment. That requires us to consider whether Ms. Rollo's report is a "formalized statement[] bearing indicia of solemnity." *Williams*, 567 U.S. at 113 (Thomas, J., concurring).

In our view, the answer to that question is unclear. On one hand, Ms. Rollo's report is unsworn, and it does not certify that the results contained in the report are accurate. In these respects, Ms. Rollo's report differs from the reports in *Melendez-Diaz* and *Bullcoming* that Justice Thomas agreed were testimonial because of their formality. And it resembles the Cellmark report that Justice Thomas concluded was not testimonial in *Williams*.

Although the word "certify" or "certification" need not appear in a forensic report to render it formal for purposes of the confrontation analysis, Ms. Rollo's report also differs from the report at issue in *Norton*, which, while not an explicit "certification," included language stating that, "within a reasonable degree of scientific certainty," Norton was the "major source of the biological material obtained from" the ski mask. *Norton*, 443 Md. at 548. In *Norton*, we stated that this language was, in substance, a certification. *See id.* at 548, 549 n.29. We emphasized that, without this "talismanic" language certifying the results of the report, the expert testimony concerning the DNA evidence "is without foundation" and "cannot cross the threshold of acceptance by the judge as gatekeeper." *Id.* at 548-49. Ms. Rollo's report does not contain any such language attesting to the accuracy of the results to a recognized standard of certainty.

On the other hand, as Leidig observes, Ms. Rollo signed the report, which also stated that the report "contains the conclusions, opinions and interpretations of the examiner

whose signature appears on the report." In addition, Leidig relies on the language in Ms. Rollo's report referencing the FBI's Quality Assurance Standards: "The deoxyribonucleic acid (DNA) results reported below were determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories." By statute, that reference to the FBI's Quality Assurance Standards ensured that Ms. Rollo's report would be admissible without the need for a hearing to determine the general reliability of Ms. Rollo's methodology. *See* Md. Code, Cts. & Jud. Proc. (CJP) § 10-915(b)(3) (2020 Repl. Vol.) ("A DNA profile is admissible under this section if it is accompanied by a statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by … [t]he Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories."). Leidig argues that the inclusion of such "validation" language is the type of "formality" that makes a forensic report testimonial. And he notes that we referenced similar language in the report at issue in *Norton* in the portion of the opinion in which we held the report to be testimonial. *See Norton*, 443 Md. at 549 ("The Report … is testimonial pursuant to Justice Thomas's concurring opinion in *Williams*, because it was certified and was signed by the analyst who had performed the test, indicating that the analyst's results had been validated according to federal standards, even if unsworn.") (footnote omitted).

As the State correctly observes, the presence of an analyst's signature on a scientific report is not, by itself, sufficient to render the report formal. After all, the Cellmark report at issue in *Williams* was signed by two laboratory directors, but Justice Thomas opined that the Cellmark report was not formal for purposes of the Sixth Amendment in that the

51

signatures did not "certify the accuracy" of the testing. *Williams*, 567 U.S. at 111 (Thomas, J., concurring). In addition, although the majority opinion in *Bullcoming* observed that the blood-alcohol test report in that case was "'formalized' in a signed document," *Bullcoming*, 564 U.S. at 665, Justice Thomas has since made clear his view that what made the *Bullcoming* report formal was not only the presence of a signature but, crucially, its certification of the truth of the analyst's findings. *See Williams*, 567 U.S. at 112 (Thomas, J., concurring). Moreover, although in *Norton* we stated that the signature of the author on the report, "indicating that the analyst's results had been validated according to federal standards," *Norton*, 443 Md. at 549, was a factor that contributed to the report's formality, we separately emphasized that different language in the report – "within a reasonable degree of scientific certainty" – rendered it "certified." *See id.* at 548.[21]

We find it significant that, in his concurring opinion in *Williams*, despite the Cellmark report's recitation of the analysts' testing methods, Justice Thomas explained that

---

[21] The State also points out that the report at issue in *Cooper* indicated "when the report was created, what items were tested, what procedures were used to develop the results, and the DNA results developed from the testing." *Cooper*, 434 Md. at 236. But we held that this was not enough to make the Shields report testimonial because "[n]owhere on either page of the report, however, is there an indication that the results are sworn to or certified or that any person attests to the accuracy of the results." *Id.* In an Appendix to its brief, the State has provided us with a copy of the Shields report. Similar to Ms. Rollo's report, the Shields report stated that "[t]he DNA profiles reported in this case were determined by procedures that have been validated according to standards established by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and adopted as Federal Standards." In our opinion in *Cooper*, we did not specifically mention this validation language. However, it is apparent from the Court's conclusion that the Shields report "lacks the formality to be testimonial," *Cooper*, 434 Md. at 236, that the Court was not persuaded the inclusion of the validation language was sufficient to render the report testimonial.

the report was not formal because it did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained." *Williams*, 567 U.S. at 111 (Thomas, J., concurring). For this reason, we believe there is a substantial possibility that Justice Thomas would hold that Ms. Rollo's report is not sufficiently formal to be testimonial, despite the reference to "the results reported below [having been] determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories." It is one thing for an analyst to state that the procedures she used have, in the past, been validated according to federally accepted standards. It is another for the analyst to state that she applied those procedures correctly in all material respects in any particular case.

Nor do we believe that Justice Thomas necessarily would be persuaded that Ms. Rollo's reference to the FBI's Quality Assurance Standards renders the report formal because it was necessary to ensure the report's admissibility under CJP § 10-915. As the State explains, § 10-915 was enacted to allow "DNA profile evidence to be admitted without reevaluation of the [DNA analysis] technique's general reliability," thereby obviating the need for a "*Frye-Reed* hearing to prove that the technique has gained general acceptance in the relevant scientific community." *Armstead v. State*, 342 Md. 38, 57 (1996).[22] Thus, Justice Thomas might well conclude that a report's invocation of the

---

[22] In *Rochkind v. Stevenson*, 471 Md. 1 (2020), we replaced the *Frye-Reed* framework with the Supreme Court's standard for expert testimony admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). That change has no bearing on this case.

Quality Assurance Standards to comply with § 10-915(b) does not constitute, in substance, a certification of the results in any given particular case.

In the end, we are unable to predict with any confidence how Justice Thomas would hold regarding the formality of Ms. Rollo's report.[23]

---

[23] We reject the State's other arguments under the Sixth Amendment for affirmance of the admission of Ms. Rollo's report and Ms. Keener's testimony conveying Ms. Rollo's findings to the jury. First, the State contends that, because Ms. Keener "peer reviewed" Ms. Rollo's report, Ms. Keener was an acceptable witness to testify about Ms. Rollo's findings. We disagree. Ms. Keener was Ms. Rollo's administrative reviewer, not her technical reviewer. As we discuss further in *State v. Miller*, No. 24 (Md. Aug. 5, 2021), the distinction between a technical review and an administrative review has constitutional significance. The former is substantive enough to allow a technical reviewer typically to qualify, in essence, as another author of the report and, therefore, able to convey the results and conclusions of the analysis contained in the report to the jury without such testimony constituting hearsay. The latter is a nonsubstantive review for grammar, typographical errors, etc., that does not qualify the administrative reviewer to speak to the substance of the report. Although the State claims that Ms. Keener's particular review of Ms. Rollo's report was substantive enough essentially to qualify as a technical review, we are not persuaded. Ms. Keener testified that she initialed each page of Ms. Rollo's report, "indicating [that she] agreed with [Ms. Rollo's] results and conclusions." This testimony is insufficient to establish that Ms. Keener performed all of the steps that, under the FBI's Quality Assurance Standards, a technical reviewer must undertake. For a more detailed discussion of those Standards, see this Court's opinion in *Miller*, *supra*, slip op. at 3-6 and 33-35.

Second, the State contends that Ms. Rollo's report was not hearsay. Rather, the State argues that her report came into evidence to provide the jury with the basis for Ms. Keener's expert testimony. This view failed to garner the support of five Justices in *Williams*. *See Williams*, 567 U.S. at 105-10 (Thomas, J., concurring); *id.* at 130 (Kagan, J., dissenting). We decline to accept it here. To the contrary, we agree with Justice Thomas that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose." *Williams*, 567 U.S. at 106 (Thomas, J., concurring). Although Maryland Rule 5-703 allows the admission of "basis" evidence in conjunction with expert testimony, a trial court nevertheless may not admit such evidence if doing so will violate the Sixth Amendment or Article 21. We recognize that, in *Cooper*, we held that the DNA report at issue in that case was admissible under Maryland Rule 5-703 as the basis for the testifying expert's opinion. 434 Md. at 230. However, we then went on to analyze whether the admission of the report violated Cooper's confrontation rights. *See id.* at 231-

### b. *We Take Our Own Path Under Article 21.*

The exercise we have just undertaken attempting to apply the Sixth Amendment jurisprudence to the facts of this case, as well as the problems that this Court and others have experienced in applying *Williams* in other cases, convince us that we should decide this case under Article 21 based on a standard that differs from the framework for Sixth Amendment analysis we adopted in *Norton*. As demonstrated above, it is debatable whether Ms. Rollo's report is sufficiently formal within the meaning of Justice Thomas's concurring opinion in *Williams* to qualify as testimonial. However, in our view, it is not debatable whether Ms. Rollo's report is testimonial. It surely is.

Suppose an eyewitness had seen a man enter the Browns' home through a living room window and a few days later told police in a sworn statement at the police station that the burglar was wearing a Philadelphia Phillies number 20 shirt. Further suppose that police eventually executed a search warrant at Leidig's residence and discovered a Mike Schmidt number 20 Phillies jersey in his closet. And finally suppose that, by the time of trial, the eyewitness has died. In that hypothetical situation, surely the State (in the absence of a prior opportunity to cross-examine the witness) would not be able to admit the witness's formal, sworn statement about the Phillies shirt into evidence through a police officer witness under Justice Thomas's interpretation of the Sixth Amendment.

---

36. Under the standard we adopt today, we likely would conclude, contrary to our decision in *Cooper*, that the DNA report at issue in that case was testimonial. However, the report nevertheless likely was admissible because the testifying expert was its technical reviewer. *See id.* at 221; *see also Miller*, No. 24, slip op. at 30-35.

But, if we assume that Justice Thomas would *not* find Ms. Rollo's report to be testimonial – a proposition that the Court of Special Appeals endorsed in this case – we see the problem. In our view, it is impossible to distinguish, in substance, the hypothetical sworn pretrial eyewitness statement to police identifying a piece of clothing worn by the burglar from Ms. Rollo's pretrial statement to police identifying the DNA profile contained in the blood that the burglar left at the scene of the crime. When they made their statements, both declarants reasonably understood that: (1) the information they gave to police would be used to try to identify the perpetrator; and (2) if the perpetrator indeed was located and charged, the declarants' information might be relevant evidence in the State's case at trial. At bottom, we cannot endorse a standard under which Ms. Rollo's report (and other similar DNA reports) is not considered "testimonial" for purposes of triggering the constitutional rights of confrontation and cross-examination. A criminal defendant in Maryland must have the right to confront and cross-examine any witness who gives such a statement to police.

As Judge Eldridge explained in his dissenting opinion in *Derr II*, this Court in numerous instances has declined to read a Maryland constitutional provision in lockstep with its federal constitutional counterpart where such a divergence is necessary and appropriate to give full effect to the rights afforded under Maryland law. *See Derr II*, 434 Md. at 146-48 (Eldridge, J., dissenting) (citing examples). As the Court stated in *Dua v. Comcast Cable*, 370 Md. 604, 621 (2002):

> Many provisions of the Maryland Constitution, such as Article 24 of the Declaration of Rights and Article III, § 40, of the Maryland Constitution, do have counterparts in the United States Constitution. We have often

commented that such state constitutional provisions are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions. Nevertheless, we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart. Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provision.

*See also, e.g.*, *Lupfer v. State*, 420 Md. 111, 130 (2011) ("Not inconsistent then with the phrase, '*in pari materia*,' we have interpreted Maryland's privilege against self-incrimination to be more comprehensive than that contained in the federal Bill of Rights.") (cleaned up).

We believe this is also an instance in which we should read a Maryland constitutional provision differently than the Supreme Court has interpreted its federal constitutional counterpart. Our prior decision in *Norton* represented this Court's best effort to bring clarity to the Sixth Amendment analysis in the context of scientific reports. However, *Norton* ultimately was an easy case to decide. The report at issue in that case was testimonial under any of the tests put forward by the various Justices in *Williams*. As is apparent from our effort to predict how Justice Thomas would rule on the question of the formality of Ms. Rollo's report, this case demonstrates the limitations of *Norton*'s framework where a case turns on whether a scientific report that does not explicitly certify its conclusions as sufficiently formal to be testimonial.

If Justice Thomas's formality requirement were the holding of the Supreme Court, we perhaps would be more reluctant to take a different approach under Article 21.

57

However, we find it significant that Justice Thomas's formality requirement remains a holding of one. No other Justice of the Supreme Court has ever agreed with Justice Thomas on this point. Moreover, the Supreme Court historically has been somewhat of a moving target in this area of law. After the Supreme Court held that the Sixth Amendment was incorporated against the States in *Pointer v. Texas* in 1965, this Court and the Court of Special Appeals began to decide confrontation challenges under the Sixth Amendment, which seemingly provided more protection than this Court up to that point had interpreted Article 21 to provide. Then, in 1980, the Supreme Court abruptly changed course with *Ohio v. Roberts*. Maryland courts followed suit, and for the next quarter-century allowed prosecutors to introduce testimonial statements as long as they satisfied a hearsay exception. *See, e.g.*, *Moon*, 300 Md. at 369; *Wildermuth*, 310 Md. at 514-20. Then, the Supreme Court once again changed course in 2004 with *Crawford*, in which it overruled *Ohio v. Roberts*, necessitating a corresponding shift in this Court's confrontation jurisprudence. And now the Supreme Court seems to be in a state of judicial gridlock when it comes to deciding what qualifies as a "testimonial" statement in a scientific report. Notably, the Court declined to grant review in *Stuart v. Alabama* in 2018, a case in which the Court seemingly could have provided such clarity if it believed it was possible to do so. As the highest court of Maryland, we decline to wait any longer for the Supreme Court to provide clarity under the Sixth Amendment, where the Maryland Constitution provides independent rights to confrontation and cross-examination – indeed, where Maryland declared the existence of those rights before the Sixth Amendment came into existence.

Our decision to chart a different course is reinforced by the recognition that we are not the only court that has struggled to make sense of these confrontation cases in the years that have passed since the Supreme Court decided *Williams.* A majority of courts have considered *Williams* to be confined to its particular facts and have applied what they believe to be a broader rule of decision from pre-*Williams* Supreme Court cases. *See, e.g.*, *State v. Sinclair*, 210 A.3d 509, 523 (Conn. 2019) (stating that the Court in *Williams* "made it impossible to identify the narrowest ground because the analyses of the various opinions are irreconcilable" and instead "rely[ing] on Supreme Court precedent before *Williams* to the effect that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial"); *see also Yohe*, 79 A.3d 520; *Michaels*, 95 A.3d 648; *Duron-Caldera*, 737 F.3d at 994. A few courts have, similar to *Norton*, incorporated both Justice Alito's plurality opinion and Justice Thomas's concurring opinion in *Williams* into a two-part test. *See Young*, 63 A.3d at 1043-44; *People v. Barba*, 155 Cal. Rptr. 3d 707, 724 (Cal. Ct. App. 2013); *State v. Hutchison*, 482 S.W.3d 893, 910-11 (Tenn. 2016).

The problem with trying to identify a broad rule of decision from *Melendez-Diaz* and *Bullcoming* is that there never have been five votes on the Supreme Court to decide the minimum requirements for a scientific report to qualify as testimonial. In both *Melendez-Diaz* and *Bullcoming*, Justice Thomas only voted in the majority because the reports at issue were sufficiently formal, from his perspective, to be testimonial. Although Justice Ginsburg cited the *Davis* primary purpose test in a footnote in her opinion for the Court in *Bullcoming*, Justice Thomas declined to join that footnote. While *Davis* itself

59

commanded an 8-1 majority, with only Justice Thomas disagreeing based on his formality/solemnity requirement, that majority evaporated once the Court began to consider the application of *Crawford* and *Davis* to statements in scientific reports. The result has been that, starting with *Melendez-Diaz*, the outcome of every Supreme Court confrontation case involving scientific reports has turned on whether Justice Thomas believed the report at issue was formal. In short, unless we are willing to allow Justice Thomas's theory of formality to continue to control those Maryland confrontation cases where a scientific report is not "accusatory," we must adopt our own standard under Article 21.

We note that we are not the first state court after *Williams* to decide a confrontation challenge on an independent state law ground. In *Commonwealth v. Tassone*, 11 N.E.3d 67 (Mass. 2014), the Supreme Judicial Court of Massachusetts declined to answer the "more challenging question, given the significant confusion that has been left in the wake of the *Williams* decision, … whether the United States Supreme Court would conclude that [the DNA evidence in Tassone's case]," admitted under the circumstances of his case, "would violate the confrontation clause." *Id.* at 72. "Fortunately," the court continued, "we need not resolve that question because, regardless of the answer, we conclude that [the testifying expert's] opinion was not admissible under our common law of evidence," *id.*, which the Court explained, "is more protective of confrontation rights" than the Sixth Amendment. *Id.* at 73.

Article 21 provides robust rights to confrontation and cross-examination that, in our view, should not vary based on the Supreme Court's shifting interpretations of the Sixth Amendment's Confrontation Clause. As Justice William J. Brennan explained:

> State constitutions … are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law – for without it, the full realization of our liberties cannot be guaranteed.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1977).

In *State v. Collins*, this Court discussed the core values of the confrontation and cross-examination rights:

> The prerogative of the defendant to have his accusers confront him is a keystone to our concept of criminal justice-grounded on the unwavering belief that an individual should be afforded the opportunity to challenge the witnesses against him through cross-examination. The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests, which the law has devised for the discovery of truth. By means of it the situation of the witness with respect to the parties, and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory, and description are all fully investigated and ascertained. It is not easy for a witness, who is subjected to this test, to impose on a Court or jury; for however artful the fabrication of falsehood may be, it cannot … embrace all the circumstances to which a cross-examination may be extended.

265 Md. at 76 (cleaned up). In rejecting the State's argument in *Collins* that the trial court had properly admitted the deposition of the principal witness against Collins, this Court stated: "Article 21 of the Maryland Declaration of Rights guarantees a defendant in a criminal prosecution the right 'to be confronted with the witnesses against him.' This

61

fundamental safeguard is also secured by the Sixth Amendment of the Federal Constitution which was made applicable to the states through the Fourteenth Amendment." *Id.* at 75. It is telling that, even several years after *Pointer* made the Sixth Amendment obligatory upon the states, this Court referred to Article 21 first and then to the Sixth Amendment.

Prior to *Williams* fully exposing the inability of the Supreme Court to agree on the minimum requirements for a scientific report to be testimonial, as a practical matter it did not make any difference whether we ascribed preeminence to Article 21 or the Sixth Amendment. We had little reason to be concerned that the outcome of a confrontation challenge might depend on which constitution was being invoked and interpreted. Our attempt to apply *Williams* to the facts of this case has convinced us that, at least for the time being, Article 21 should again be first in our minds, and that we should break *Williams*'s gridlock as a matter of state constitutional law. Our reluctance to adhere to the Supreme Court's Sixth Amendment jurisprudence to decide such confrontation challenges is increased by the Supreme Court's apparent inability to bring needed clarity to this area of the law. We believe that we should wait no longer for the Supreme Court to solve the problem as it affects the criminal judicial system in Maryland.

In sum, we believe that Maryland trial courts, criminal defendants and defense counsel, and prosecutors need and deserve clarity and predictability in this area of the law. Adopting a standard for what makes a scientific report "testimonial" under Article 21 will allow us to provide that clarity and predictability without concern that our jurisprudence will change yet again when the Supreme Court eventually resolves its current impasse concerning what makes a scientific report testimonial under the Sixth Amendment.

Accordingly, we shall adopt the approach Judge Eldridge suggested in his *Derr II* dissent and decide this case under the independent state law ground provided by Article 21's rights of confrontation and cross-examination.[24]

### c. The Standard Under Which a Scientific Report Is "Testimonial" Under Article 21

We no longer are content to allow Justice Thomas's formality requirement to control a subset of Maryland confrontation challenges. As is apparent from our analysis above, Justice Thomas's formality requirement is difficult to apply in a case such as this one, where an analyst does not certify the accuracy of her results, but her report references the use of standards and methods that are generally accepted and does so in compliance with a statute governing the admissibility of DNA reports. But our concern about Justice Thomas's formality requirement goes beyond the facts of this case and other cases involving similarly worded DNA reports. There is a fundamental tension between Justice Thomas's demand for formality and the substantive right to confrontation. Simply put, we respectfully believe that Justice Thomas's approach places form over substance to the detriment of the rights afforded under Article 21.

In her dissenting opinion in *Williams*, Justice Kagan advocated for application of the *Davis* "primary purpose" standard to the determination whether a scientific report is testimonial. *See Williams*, 567 U.S at 135 (Kagan, J., dissenting) (scientific report is

---

[24] If the Supreme Court subsequently interprets the Sixth Amendment Confrontation Clause to provide greater protection than we afford to a criminal defendant under Article 21, Maryland courts will, of course, be bound to apply such a new Sixth Amendment standard.

"testimonial" if it was created for the "primary purpose of establishing past events potentially relevant to later criminal prosecution – in other words, for the purpose of providing evidence") (cleaned up). Three other Justices, including Justice Scalia – the architect of 21st century Confrontation Clause jurisprudence – joined Justice Kagan in advocating for application of this standard to cases involving scientific reports. That same group of four had earlier voiced their approval of this "primary purpose" standard in *Bullcoming*. We agree with these four Justices that this "primary purpose" standard is just as appropriate for application to scientific reports as it is to other out-of-court statements, such as responses to unsworn police questioning. In our view, this standard furthers the core values of Article 21's rights to confrontation and cross-examination.

As Justice Scalia indicated in *Davis*, the test is an objective one. *See Davis*, 547 U.S. at 822 (statements in response to police interrogation are testimonial "when the circumstances objectively indicate that … the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"); *id.* at 830 (victim's statements in response to police questioning were testimonial where, "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime"); *see also Crawford*, 541 U.S. at 51-52 (stating, among various formulations of the "core class" of testimonial statements, "pretrial statements that declarants would reasonably expect to be used prosecutorially" and "statements made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial").

Thus, we hold that, under Article 21, a statement contained in a scientific report is testimonial if a declarant reasonably would have understood that the primary purpose for the creation of the report was to establish or prove past events potentially relevant to later criminal prosecution. If the trial court concludes that a scientific report is testimonial under this standard, the report (and/or testimony relaying the information set forth in the report to the trier of fact) is inadmissible under Article 21 unless the declarant is unavailable to testify and the defendant previously had the opportunity to cross-examine the declarant concerning the report. We adopt these concepts from Justice Scalia's majority opinions in *Crawford* and *Davis* and Justice Kagan's dissenting opinion in *Williams* as our standard under Article 21 because, collectively, they give full effect to the substance of Article 21.

Application of this standard in the context of a scientific report will require trial courts to consider – upon a defendant's confrontation objection to the admission of a non-testifying declarant's out-of-court statement – the totality of the circumstances that shed light, objectively, on the primary purpose of its creation. The points emphasized by Justice Alito and Justice Thomas in their respective *Williams* opinions – whether the report is "accusatory" in that it specifically targets the defendant, or whether the report is "formal" or "solemn" in that it certifies the accuracy of the results – are factors that the trial court should consider in making this assessment. It is difficult to conceive of a scientific report that is accusatory or that certifies its results as accurate that would not meet the standard we adopt today.[25]

---

[25] Indeed, under *Norton*, which we do not overrule, such a report presumably would also be testimonial under the Sixth Amendment.

Justice Kagan alluded to other relevant factors in her dissenting opinion in the course of comparing the Cellmark report at issue in *Williams* with the testimonial documents at issue in *Melendez-Diaz* and *Bullcoming*:

> The report at issue here shows a DNA profile produced by an analyst at Cellmark's laboratory, allegedly from a vaginal swab taken from a young woman, L.J., after she was raped. That report is identical to the one in *Bullcoming* (and *Melendez–Diaz*) in all material respects. Once again, **the report was made to establish "'some fact' in a criminal proceeding"**—here, the identity of L.J.'s attacker. [*Bullcoming*, 564 U.S.] at ——, 131 S.Ct., at 2716 (quoting *Melendez–Diaz*, 557 U.S., at 310, 129 S.Ct. 2527). And once again, **it details the results of forensic testing on evidence gathered by the police.** Viewed side-by-side with the *Bullcoming* report, the Cellmark analysis **has a comparable title; similarly describes the relevant samples, test methodology, and results; and likewise includes the signatures of laboratory officials.** So under this Court's prior analysis, the substance of the report could come into evidence only if Williams had a chance to cross-examine the responsible analyst.

567 U.S. at 122-23 (Kagan, J., dissenting) (emphasis added) (some internal quotation marks and citations omitted).

The points we have mentioned here from the various *Williams* opinions do not comprise an exhaustive list of factors to be considered in determining whether a reasonable declarant would have understood that the primary purpose for the creation of a report was to establish past events potentially relevant to later criminal prosecution. There may well be other factors to consider in any given case.

We also note two points that may often be important for trial courts to consider in resolving confrontation objections under Article 21. First, as discussed in more detail in the other confrontation case we decide today, *State v. Miller*, No. 24 (Md. Aug. 5, 2021), if a testifying witness thoroughly reviewed a scientific report for substance at the time of

66

its creation – providing a "technical" review of the primary author's results and conclusions within the meaning of the FBI's Quality Assurance Standards – and signed off on its issuance, the witness may convey the information contained in the report to the factfinder without violating Article 21. In such an instance, the report is effectively not just the work product of the primary author, but also that of the technical reviewer who acknowledged their agreement with the substance of the report at the time of its issuance.

Second, the State is not required to call every technician who performed some part of the testing that led the authoring analyst(s) to state the results and conclusions contained in the report. We agree with the recent assessment of the Supreme Court of Connecticut (relying on an earlier decision of the New York Court of Appeals) on this question:

> We observe that this opinion does not conclude that all analysts who participate in the process of generating a DNA profile necessarily must testify. We simply conclude that, where the generation of a DNA profile is testimonial, "at least one analyst with the requisite personal knowledge must testify." *People v. John*, [52 N.E.3d 1114, 1126 (N.Y. 2016)]. In this regard, we agree with the New York Court of Appeals that "the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages," are not necessary witnesses. *Id.* [at 1127.] Rather, "it is the generated numerical identifiers and the calling of the alleles at the final stage of the DNA typing that effectively accuses [the] defendant of his role in the crime charged." *Id.* Accordingly, to satisfy the confrontation clause, the state need only call as a witness an analyst with personal knowledge concerning the accuracy of the numerical DNA profile generated from the preliminary stages of testing.

*State v. Walker*, 212 A.3d 1244, 1267 (Conn. 2019).[26]

---

[26] Although the *Walker* Court, quoting *John*, referred to DNA typing "that effectively accuses [the] defendant of his role in the crime charged," 212 A.3d at 1267, it does not matter whether the report is accusatory (as Ms. Keener's was in this case) or not accusatory (as Ms. Rollo's report was). Where the State introduces the results of any

*d.  Application of the Article 21 Standard to this Case*

The application of the Article 21 standard we have adopted to the facts of this case is straightforward. It is beyond dispute that Ms. Rollo provided her results and conclusions in her report to the police for the purpose of establishing past events potentially relevant to a future prosecution. She reported that the swabs taken from the area of the broken window in the Browns' home contained blood, and that the blood contained a specific DNA profile from a single male source. These facts were relevant to a potential criminal proceeding because they tended to identify the burglar. Ms. Rollo's document was labeled a "Laboratory Report"; it described the relevant samples, test methodology – including that the methods satisfied the FBI's Quality Assurance Standards for Forensic Testing Laboratories – and results; and included Ms. Rollo's signature and the initials of other laboratory officials. The language in Ms. Rollo's report referencing the FBI's Quality Assurance Standards, even if not rendering the report sufficiently formal to satisfy Justice Thomas, strikes us as particularly meaningful. A reasonable declarant would understand that the report's reference to the FBI's Quality Assurance Standards served to comply with CJP § 10-915(b), and thereby render the report admissible at trial without a hearing to determine the general reliability of the laboratory's testing methods. This adds powerfully to the understanding that a reasonable DNA analyst in Maryland would have about the potential use of their report.

---

scientific testing at trial, an analyst with personal knowledge concerning that evidence must be available for cross-examination.

68

For all of these reasons, we believe it is beyond dispute that a reasonable declarant would have understood that Ms. Rollo's report was intended to provide evidence for a potential future criminal trial. As such, under Article 21, Ms. Rollo's report and Ms. Keener's testimony conveying Ms. Rollo's findings to the jury could come into evidence only if Leidig had a chance to cross-examine Ms. Rollo. Although the State had subpoenaed Ms. Rollo, the State elected not to present her testimony. Because Ms. Keener was merely Ms. Rollo's administrative reviewer, not her technical reviewer, the State's introduction of Ms. Rollo's report without calling Ms. Rollo to allow Leidig to cross-examine Ms. Rollo, violated Leidig's right to confrontation under Article 21. A new trial is required.[27]

## IV

## Conclusion

For the reasons stated above, we conclude that, under Article 21 of the Maryland Declaration of Rights, a statement contained in a scientific report is testimonial if a reasonable declarant would have understood that the primary purpose for the creation of the report was to establish or prove past events potentially relevant to later criminal prosecution. If a trial court concludes that a scientific report is testimonial under this

---

[27] The State does not argue that, if the trial court erred in admitting Ms. Rollo's report, the error was harmless beyond a reasonable doubt. And for good reason. The DNA profile extracted from the blood on the window frame and curtain, as identified in Ms. Rollo's report, matched the DNA profile from Leidig's known reference sample. That match was the only evidence linking Leidig to the crime. Thus, without Ms. Rollo's report coming into evidence and/or Ms. Rollo's results being conveyed to the jury by Ms. Keener, no reasonable juror could have found Leidig guilty of the Brown burglary.

69

standard, the report (and/or testimony relaying the information set forth in the report to the trier of fact) is inadmissible under Article 21 unless the declarant is unavailable to testify and the defendant previously had the opportunity to cross-examine the declarant concerning the report (or unless the testifying expert conducted a technical review of the report prior to its issuance). In this case, the trial court admitted Ms. Rollo's report into evidence and allowed Ms. Keener to convey the results contained in Ms. Rollo's report to the jury, all without requiring that Ms. Rollo be available for cross-examination. This violated Leidig's rights to confrontation and cross-examination under Article 21. For these reasons, we reverse the judgment of the Court of Special Appeals and order a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR WASHINGTON COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY WASHINGTON COUNTY.**



*SA 12-14-16 exhibits*
*1606053*

**STATE OF MARYLAND**
**MARYLAND STATE POLICE**
1201 REISTERSTOWN ROAD
PIKESVILLE, MARYLAND 21208-3899
410-486-3101
TOLL FREE: 1-800-525-5555
T D D: 410-486-0677

**LARRY HOGAN**
GOVERNOR

**BOYD K. RUTHERFORD**
LT. GOVERNOR

**COLONEL**
**WILLIAM M. PALLOZZI**
SUPERINTENDENT

**FORENSIC SCIENCES DIVISION – PIKESVILLE**
**LABORATORY REPORT**
**Phone: 443-357-1300**

**TO: Washington County Sheriff's Office**

**DATE: October 14, 2016**

**ATTENTION: Cpl. David Haugh S7116**

---

**Requestor's Case #: 1606053**

**Laboratory File #: 2016-FSD21-09158**

**Victim: Ralph Douglas Brown**

**Suspect: Unknown**

---

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory Report will be used for official purposes only related to the investigation or a subsequent criminal prosecution. This report contains the conclusions, opinions and interpretations of the examiner whose signature appears on the report.

**Results and Conclusions of Examination/Analysis**

The deoxyribonucleic acid (DNA) results reported below were determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories.

Exhibit 1: Swabs (2) of window frame
    Blood was indicated.

Exhibit 2: Swabs (2) of living room curtain
    Blood was indicated.

Exhibits 1 and 2 were forwarded for DNA extraction and quantitation.

**Quantitation Results**

- Human and male DNA was detected in the following exhibits: 1 and 2.

The following exhibits were processed for autosomal short tandem repeat (STR) DNA analysis and were amplified and typed at sixteen genetic loci: 1 and 2.

*"Maryland's Finest"*

## AUTOSOMAL STR TYPING RESULTS and CONCLUSIONS

| Exhibit<br><br>Locus | [1]<br>Window frame | [2]<br>Curtain |
|---|---|---|
| D8S1179 | 13,14 | 13,14 |
| D21S11 | 31.2 | 31.2 |
| D7S820 | 10,11 | 10,11 |
| CSF1PO | 10,13 | 10,13 |
| D3S1358 | 17,18 | 17,18 |
| TH01 | 7,8 | 7,8 |
| D13S317 | 11,13 | 11,13 |
| D16S539 | 11,12 | 11,12 |
| D2S1338 | 17,18 | 17,18 |
| D19S433 | 13,16.2 | 13,16.2 |
| vWA | 17,19 | 17,19 |
| TPOX | 11,12 | 11,12 |
| D18S51 | 14 | 14 |
| D5S818 | 9,11 | 9,11 |
| FGA | 21,22.2 | 21,22.2 |
| Amelogenin | XY | XY |

**Exhibit 1: Swabs of window frame**
**Exhibit 2: Swabs of living room curtain**

A DNA profile from one male contributor was obtained.

**Notes**
- The DNA profile from the swabs of the window frame [1] will be entered into the National DNA Index System (NDIS) database.
- The above exhibits of evidence will be held at the MSP Forensic Sciences Division until called for by a representative of your department.
- The remaining amplified DNA will be stored in a freezer at the MSP Forensic Sciences Division for at least three months.
- Limited portions of exhibits 1 and 2 are available for independent testing and are being maintained with the evidence.

Examiner: _Molly Rollo_
**Molly Rollo, MFS**
**MSP Forensic Scientist III**

**Please arrange for prompt retrieval of evidence.**

MSP21-8A (2/22/2012)



**STATE OF MARYLAND**
**MARYLAND STATE POLICE**
1201 REISTERSTOWN ROAD
PIKESVILLE, MARYLAND 21208-3899
410-486-3101
TOLL FREE: 1-800-525-5555
T D D: 410-486-0677



**LARRY HOGAN**
GOVERNOR

**BOYD K. RUTHERFORD**
LT. GOVERNOR

**COLONEL**
**WILLIAM M. PALLOZZI**
SUPERINTENDENT

**FORENSIC SCIENCES DIVISION – PIKESVILLE**
**LABORATORY REPORT**
Phone: 443-357-1300

**TO: Washington County Sheriff's Office**

**DATE: April 17, 2017**

**ATTENTION: Cpl. David Haugh S7116**

---

**Requestor's Case #: 1606053**

**Laboratory File #: 2016-FSD21-09158**

**Victim: Ralph Douglas Brown**

**Suspect: James Matthew Leidig**

---

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory Report will be used for official purposes only related to the investigation or a subsequent criminal prosecution. This report contains the conclusions, opinions and interpretations of the examiner whose signature appears on the report.

**This report is supplemental to the original Maryland State Police report dated October 14, 2016.**

**Results and Conclusions of Examination/Analysis**

The deoxyribonucleic acid (DNA) results reported below were determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories.

Exhibit 3: Known oral standard from James Leidig

Exhibit 3 was forwarded for DNA extraction and quantitation.

**Quantitation Results**

- Human and male DNA was detected in the following exhibit: 3.

The following exhibit was processed for autosomal short tandem repeat (STR) DNA analysis and was amplified and typed at twenty-four loci: 3.

The following exhibits were previously processed for autosomal STR DNA analysis and were amplified and typed at sixteen loci: 1 and 2.

*"Maryland's Finest"*

STATE OF MARYLAND
MARYLAND STATE POLICE

## AUTOSOMAL STR TYPING RESULTS and CONCLUSIONS

| Exhibit<br><br>Locus | [1]<br>Window frame | [2]<br>Curtain | [3]<br>James Leidig |
|---|---|---|---|
| D3S1358 | 17,18 | 17,18 | 17,18 |
| vWA | 17,19 | 17,19 | 17,19 |
| D16S539 | 11,12 | 11,12 | 11,12 |
| CSF1PO | 10,13 | 10,13 | 10,13 |
| TPOX | 11,12 | 11,12 | 11,12 |
| Yindel | Not Tested | Not Tested | 2 |
| Amelogenin | X,Y | X,Y | X,Y |
| D8S1179 | 13,14 | 13,14 | 13,14 |
| D21S11 | 31.2 | 31.2 | 31.2 |
| D18S51 | 14 | 14 | 14 |
| DYS391 | Not Tested | Not Tested | 10 |
| D2S441 | Not Tested | Not Tested | 11,14 |
| D19S433 | 13,16.2 | 13,16.2 | 13,16.2 |
| TH01 | 7,8 | 7,8 | 7,8 |
| FGA | 21,22.2 | 21,22.2 | 21,22.2 |
| D22S1045 | Not Tested | Not Tested | 15,16 |
| D5S818 | 9,11 | 9,11 | 9,11 |
| D13S317 | 11,13 | 11,13 | 11,13 |
| D7S820 | 10,11 | 10,11 | 10,11 |
| SE33 | Not Tested | Not Tested | 15,30.2 |
| D10S1248 | Not Tested | Not Tested | 12 |
| D1S1656 | Not Tested | Not Tested | 12,15 |
| D12S391 | Not Tested | Not Tested | 21,22 |
| D2S1338 | 17,18 | 17,18 | 17,18 |

B-2

STATE OF MARYLAND
**MARYLAND STATE POLICE**

**Exhibit 1: Swabs of window frame**
**Exhibit 2: Swabs of living room curtain**
A DNA profile from one male contributor was obtained. The DNA profile from James Leidig [3] matches this DNA profile at all autosomal loci tested except D2S441, D22S1045, SE33, D10S1248, D1S1656 and D12S391. The probabilities of selecting an unrelated individual at random having this DNA profile are approximately:

| Population Database | Frequency |
|---|---|
| US Caucasian | 1 in 9.7 Sextillion ($9.7 \times 10^{21}$) |
| African American | 1 in 3.0 Septillion ($3.0 \times 10^{24}$) |
| US Hispanic | 1 in 5.0 Sextillion ($5.0 \times 10^{21}$) |

Because the rarity of this profile exceeds 1 in 333 billion, it is unreasonable to conclude that an unrelated individual would be the source of this DNA profile.

The following loci could not be used in the statistical calculations because they were not tested:
D2S441, D22S1045, SE33, D10S1248, D1S1656, D12S391.

**Notes**
- Any statistics provided for autosomal STR results do not include the Amelogenin, Yindel or DYS391 loci.
- The above exhibit of evidence will be held at the MSP Forensic Sciences Division until called for by a representative of your department.
- The remaining amplified DNA will be stored in a freezer at the MSP Forensic Sciences Division for at least three months.
- Additional portions of exhibit 3 are available for independent testing and are being maintained with the evidence.

Examiner: _Tiffany Keener_
**Tiffany Keener**
**MSP Forensic Scientist III**

**Please arrange for prompt retrieval of evidence.**

Circuit Court for Washington County
Case No. C-21-CR-19-000099

Argued: December 3, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 19

September Term, 2020
_____

JAMES MATTHEW LEIDIG

v.

STATE OF MARYLAND
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.
_____

Concurring Opinion by Watts, J.
_____

Filed: August 5, 2021

Respectfully, I concur. Like the Majority, I would reverse the judgment of the Court of Special Appeals (which affirmed Leidig's convictions). I would hold that admitting into evidence at trial a laboratory report containing information about DNA profiles from material found at the crime scene and testimony about the report from someone who was not the author violated the Confrontation Clause of the Sixth Amendment to the Constitution of the United States and the right to confrontation under Article 21 of the Maryland Declaration of Rights. In my view, this is because the report in this case, although not accusatory, is testimonial as it is a formalized statement. In reaching this conclusion, I would not depart from existing case law from this Court concerning the standard for determining whether documents are testimonial. In my view, no exception to the doctrine of *stare decisis* is applicable and, as such, there is no basis for departing from our precedent.

This Court has previously held that the right to confrontation under the Sixth Amendment is read *in pari materia* with the right to confrontation under Article 21. In Derr v. State, 434 Md. 88, 105, 103 n.11, 73 A.3d 254, 264, 263 n.11 (2013)—which is commonly known as "Derr II" to distinguish it from our earlier decision in Derr v. State, 422 Md. 211, 29 A.3d 533 (2011) ("Derr I"), cert. granted, judgment vacated sub nom. Maryland v. Derr, 567 U.S. 948 (2012)—we expressly declined the defendant's invitation to hold that his right to confrontation was violated under Article 21. In that case, a forensic DNA examiner testified that DNA taken from swabs of the alleged victim of a rape matched DNA taken from the defendant. See Derr II, 434 Md. at 100-01, 73 A.3d at 261. The forensic DNA examiner did not conduct or supervise serological testing of the

swabs (in 1985) or DNA testing of a rape kit (in 2002), *i.e.*, the examiner did not participate in the testing of material or samples originally taken from the victim.  See id. at 102, 73 A.3d at 262.

In Derr I, 422 Md. at 253, 29 A.3d at 559, we held that the trial court violated the Confrontation Clause by admitting the results of the DNA tests as the basis for the forensic DNA examiner's expert opinion that the defendant was the source of the DNA found on the alleged victim, but we did not reach a conclusion as to a violation of Article 21.  We mentioned Article 21 in two instances, in both of which we observed that Article 21 protected "[t]he same right" as the Confrontation Clause.  See id. at 224, 216 n.3, 29 A.3d at 542, 537 n.3 (citations omitted).  In other words, in Derr I, the primary basis of our holding was the Confrontation Clause, and this Court did not decide any matter specifically with regard to Article 21.

In Derr I, the State filed a petition for a writ of *certiorari* in the Supreme Court.  See Derr, 567 U.S. 948.  The Supreme Court engaged in what is commonly known as a "GVR" by granting the petition, vacating this Court's judgment, and remanding to this Court for further consideration in light of the Supreme Court's decision in Williams v. Illinois, 567 U.S. 50 (2012), which it issued the year after we decided Derr I.  See Derr, 567 U.S. 948.  The Williams case, in which there was no majority opinion, is the source of the "accusatory" and "formal" tests for determining whether a forensic document is testimonial.

On remand, we addressed the issue that we had not addressed in Derr I— specifically, whether the right to confrontation under Article 21 was broader than the same

right under the Confrontation Clause.  See Derr II, 434 Md. at 103, 73 A.3d at 263.  We

observed that, "[n]oting the difference between the language in the Sixth Amendment and

Article 21, [the defendant] assert[ed] that we 'should reinstate [our] prior decision and

judgment in this case, and plainly state that the decision is based on the independent state

ground of Article 21, as well as the Sixth Amendment.'"  Id. at 105, 73 A.3d at 264 (last

alteration in original).  We quoted the defendant's contention that "principles of federalism

support an independent assessment of the rights of confrontation and cross-examination

under Article 21" and that "[t]he decision here can—and should, therefore—plainly state

that it is grounded on an independent assessment of the rights of confrontation and cross-

examination protected under the Maryland Declaration of Rights."  Id. at 104-05, 73 A.3d

at 264.

> Nonetheless, we specifically declined the defendant's invitation, stating:
>
> Both the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights provide a criminal defendant in a Maryland court with the right to confront witnesses who testify against the defendant. *Cox v. State*, 421 Md. 630, 642, 28 A.3d 687, 694 (2011). **In past cases, we have read the two rights *in pari materia*, or as generally providing the same protection to defendants.** *See Grandison v. State*, 425 Md. 34, 64, 38 A.3d 352, 370 (2012); *Lawson v. State*, 389 Md. 570, 587 n. 7, 886 A.2d 876, 886 n. 7 (2005); *State v. Snowden*, 385 Md. 64, 74-75 n. 9, 867 A.2d 314, 320 n. 9 (2005). **Derr has failed to persuade this Court to deviate from that practice, and so we shall consider both rights under the same analysis.**

Derr II, 434 Md. at 103, 73 A.3d at 263 (emphasis added) (footnotes omitted).  In a footnote

immediately following the last sentence of that paragraph, we elaborated:

> Although there is no majority opinion of the Supreme Court in *Williams*, as we indicate below, the narrowest grounds leading to the judgment of the Court can be discerned and applied in the present case.  Therefore, we

analyze the present case applying *Williams* and base our decision on the Sixth Amendment read *in pari materia* with Article 21 of the Maryland Declaration of Rights.

Derr II, 434 Md. at 103 n.11, 73 A.3d at 263 n.11. We ultimately concluded that the DNA test results at issue in Derr II were not sufficiently formalized and thus were nontestimonial, and that, accordingly, the trial court did not violate the defendant's right to confrontation. See id. at 118, 73 A.3d at 272.

In a dissenting opinion that Chief Judge Bell joined, Judge Eldridge opined that the trial court violated the defendant's right to confrontation under Article 21. See Derr II, 434 Md. at 140-41, 73 A.3d at 285 (Eldridge, J., dissenting). A majority of this Court, however, declined to find a violation of Article 21 on the ground that there was no reason to deviate from our longstanding practice of reading Article 21 *in pari materia* with the Confrontation Clause. See id. at 103, 73 A.3d at 263. Plainly, for us to now break from the precedent set in Derr II, an exception to the doctrine of *stare decisis* would need to apply.

Both Derr II and this case involve issues as to the admissibility of the same type of DNA reports—namely, reports that provide information about DNA that an unknown individual left on a victim's person or at a crime scene. In Derr II, 434 Md. at 97-99, 73 A.3d at 259-60, multiple tests were conducted, specifically, a serological exam in 1985 that identified biological material on swabs from the alleged victim, DNA testing in 2002 of material from the swabs that generated a DNA profile of the suspect, and eventually DNA testing/analysis that compared the defendant's DNA profile to those from the swabs from the alleged victim. The defendant raised, and we rejected, challenges to the admissibility of the 1985 serological testing and the DNA testing in 2002 and 2004. See id. at 96-97,

118-20, 73 A.3d at 258-59, 272-73. We specifically "conclude[d] that the results from the 2002 DNA test [we]re not sufficiently formalized to be testimonial." Id. at 119, 73 A.3d at 272. Like the 2002 DNA testing at issue in Derr II, the Laboratory Report at issue in this case provides a DNA profile of an individual (who is not identified in the Laboratory Report) based on biological material retrieved from a crime scene. In other words, the same type of report that was at issue in Derr II is at issue in this case.

The body of Supreme Court precedent concerning whether a forensic document is testimonial is in the same state that it was when we decided Derr II in 2013. Both then and now, Williams, 567 U.S. 50, decided in 2012, was the Supreme Court's most recent decision on the issue. To depart from the unambiguous precedent we set in Derr II regarding the Sixth Amendment being read *in pari materia* with the right to confrontation under Article 21, an exception to the doctrine of *stare decisis* would need to apply.[1]

_____

[1]Citing Commonwealth v. Tassone, 11 N.E.3d 67 (Mass. 2014), the Majority states that this is not the first time in which a State court has "decide[d] a confrontation challenge on an independent state law ground." Maj. Slip Op. at 60. As the Majority acknowledges, however, the decision of the Supreme Judicial Court of Massachusetts in Tassone was based on the "common law of evidence" in Massachusetts—as opposed to the Constitution of the Commonwealth of Massachusetts. Maj. Slip Op. at 60 (quoting Tassone, 11 N.E.3d at 72). In Massachusetts, the "common law of evidence requires that the defendant have a meaningful opportunity to cross-examine [an] expert about her opinion and the reliability of the facts or data that underlie her opinion." Tassone, 11 N.E.3d at 73 (citations omitted). In Tassone, id. at 74-75, the Supreme Judicial Court of Massachusetts held that, "[b]ecause the defendant [] had no meaningful opportunity for cross-examination, the admission of [an expert]'s opinion violated the right to confrontation provided by [the] common law of evidence." (Citations omitted).

Significantly, in Tassone, id. at 76 n.3, the Supreme Judicial Court of Massachusetts observed that, before Williams, 567 U.S. 50, it had stated in a previous case "that the protection provided by" Article 12 of the Massachusetts Declaration of Rights—under which a defendant has the right "to meet the witnesses against him face to face"—"is

- 5 -

After the Supreme court's decision in <u>Williams</u>, we set forth a test for determining whether a forensic document is testimonial. In <u>State v. Norton</u>, 443 Md. 517, 547, 117 A.3d 1055, 1073 (2015), we held that a forensic document is testimonial under <u>Williams</u> where it is either formal or accusatory. Specifically, we stated that, in determining whether reports are testimonial, trial courts should "review[] the admissibility of forensic documents under the Confrontation Clause, to consider first, whether the report in issue is formal, as analyzed by Justice Thomas," or, if not, whether it is accusatory as described by Justice Alito. <u>Norton</u>, 443 Md. at 547, 117 A.3d at 1073. To the extent that <u>Williams</u> created confusion or made it difficult for State courts to apply the definition of the term "testimonial," we ended the allegation as to confusion or difficulty in Maryland with <u>Norton</u> by adopting the test we distilled from <u>Williams</u>. There have not been any significant changes in the law or the facts in the six years since we decided <u>Norton</u> to justify a decision that "we should decide this case under Article 21 based on a standard that differs from the framework for Sixth Amendment analysis we adopted in *Norton*." Maj. Slip Op. at 55.

In fact, we have a history of reading Article 21 *in pari materia* with corresponding federal constitutional provisions. In <u>Grandison v. State</u>, 425 Md. 34, 64-65, 38 A.3d 352, 370 (2012), as we did later in <u>Derr II</u>, 434 Md. at 103, 73 A.3d at 263, we declined a

---

coextensive with the guarantees of the Sixth Amendment[.]" (Cleaned up). The Supreme Judicial Court of Massachusetts stated that it would "leave open the question whether that remains true after *Williams*." <u>Tassone</u>, 11 N.E.3d at 76 n.3. The Supreme Judicial Court of Massachusetts has apparently not yet answered that question. In Maryland, after <u>Williams</u>, this Court answered that question in <u>Derr II</u>.

defendant's request to depart from precedent under which we have read the right to confrontation under Article 21 *in pari materia* with the Confrontation Clause of the Sixth Amendment. In multiple other cases, we have reiterated that we read the two constitutional provisions *in pari materia*. See, e.g., Peterson v. State, 444 Md. 105, 122 n.4, 118 A.3d 925, 934 n.4 (2015); Miller v. State, 435 Md. 174, 197-98, 77 A.3d 1030, 1043-44 (2013). In Lodowski v. State, 307 Md. 233, 247, 245, 513 A.2d 299, 307, 306 (1986), we declined a defendant's request to read the right to counsel under Article 21 more broadly than the same right under the Counsel Clause of the Sixth Amendment. In multiple other cases, we have reiterated that we read the two constitutional provisions *in pari materia*. See, e.g., State v. Walker, 417 Md. 589, 604 n.8, 11 A.3d 811, 820 n.8 (2011); State v. Campbell, 385 Md. 616, 626 n.3, 870 A.2d 217, 223 n.3 (2005). If we develop a new basis for departing from the practice of reading Article 21 *in pari materia* with corresponding federal constitutional provisions whenever we believe it to be "necessary and appropriate[,]" Maj. Slip Op. at 56 (citing Derr II, 434 Md. at 146-48, 73 A.3d at 288-90 (Eldridge, J., dissenting)), we establish worrisome precedent that could affect our case law in other areas and our adherence to the principle of *stare decisis* in general.

Here, the new standard that the Majority sets forth is as follows: "[U]nder Article 21, a scientific report is 'testimonial' if the author of the report reasonably would have understood that the primary purpose for the creation of the report was to establish or prove

past events potentially relevant to later criminal prosecution." Maj. Slip Op. at 3.[2] The Majority's interpretation of Article 21 does not require that a report contain any indicia of formality or be accusatory to be considered testimonial, but rather specifically requires that the author would reasonably have understood that the purpose of the report was to document events that may be relevant to a later criminal prosecution.

In reaching its decision, the Majority departs from the principle of *stare decisis* and sets forth its own standard for determining whether a report is "testimonial" because the Majority decides that it is "necessary and appropriate" to do so. Maj. Slip Op. at 56 (citing Derr II, 434 Md. at 146-48, 73 A.3d at 288-90 (Eldridge, J., dissenting)). Yet, in Derr II, 434 Md. at 103, 73 A.3d at 263, we explicitly refused to depart from our longstanding practice of reading the right to confrontation under Article 21 *in pari materia* with the Confrontation Clause. Since we decided Derr II eight years ago in 2013, and Norton in 2015, nothing has changed with respect to the law and nothing is alleged to have changed with regard to the facts and circumstances concerning DNA analysis to satisfy an exception to the principle of *stare decisis*.

In the past, there may have been times when we sanctioned a change in case law where, arguably, reasonable minds could differ as to whether the principle of *stare decisis* was adhered to, *i.e.*, whether there were sufficient grounds to apply an exception to the principle. In this case, though, in the majority opinion, there is no mention of the principle

---

[2]It appears that the accusatory prong of the current test for testimonial material as set forth in Norton would be subsumed by the standard that the Majority sets forth. In this case, however, there is no issue as to whether the Laboratory Report was accusatory.

of *stare decisis* and no explanation of whether an exception to the principle applies. I think that we should adhere to the principle of *stare decisis* in determining whether to make such a change and not sacrifice the integrity of our case law that the principle of *stare decisis* fosters.

To be sure, this may be a close case in terms of utilizing existing law to determine whether a report is testimonial. That, however, should not preclude us from making a decision under existing law, namely, our holdings in Derr II and Norton. This Court should not simply determine that the result under existing law is unclear and set forth a different standard for determining whether a report is "testimonial." My view with respect to the majority opinion might be different if this Court had not already reviewed the Supreme Court's decision in Williams, declined to develop a different standard for purposes of Article 21 in Derr II, and set forth the standard we thought appropriate in our holding in Norton. In other words, my view might be different if we were writing on a clean slate.

Under existing law, good arguments can be made in favor of the conclusion that the Laboratory Report is nontestimonial and also in favor of the result, that I would reach, that the report is sufficiently formalized to be testimonial. Like the Majority, I would conclude that it was not permissible for the circuit court to admit the Laboratory Report into evidence but for different reasons. In this instance, the Laboratory Report was made at the request of a police department and states that it contains the conclusions of the forensic scientist who signed it, and that the DNA analysis results "were determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories." This attestation causes the Laboratory

Report to be similar to DNA reports that have been determined to be formalized statements in prior cases before the Supreme Court and this Court and dissimilar from those that have been determined not to be formal.

Here, at a minimum, the author of the report assures or certifies that the results were obtained using procedures approved under FBI quality assurance standards for DNA testing. A fair inference from the statement, though, is that the author of the report is assuring that the test results are valid under FBI DNA laboratory testing standards. Unlike with the report in Williams, by declaring that the results were "determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories[,]" the author of the Laboratory Report in this case essentially certifies that the results in the report are correct. See Williams, 567 U.S. at 111-12 (Thomas, J., concurring). Unlike the report in Derr II, 434 Md. at 119, 73 A.3d at 272-73, where there were "[n]o statements . . . anywhere on the results attesting to their accuracy or that the analysts who prepared them followed any prescribed procedures[,]" the report in this case contains just such a statement.

The Laboratory Report in this case is similar to the Forensic DNA Case Report in Norton. There, this Court held that the phrase "'within a reasonable degree of scientific certainty'" constituted a certification that rendered the Forensic DNA Case Report in Norton formal and thus testimonial. Norton, 443 Md. at 548, 117 A.3d at 1073. To be sure, the Laboratory Report in this case does not state that the results are accurate to a reasonable degree of scientific certainty, which is the standard for admission at trial for expert testimony. But, the Laboratory Report offers the statement of its author that the

results of the report were determined under applicable professional standards. This statement or certification assuring the validity of the results is a formalization of the report made in contemplation of use of the report in a criminal prosecution. Permitting the report to be admitted into evidence without affording Leidig the opportunity to cross-examine its author about the statement that the report's results were obtained under procedures that met FBI standards and about the report's results would violate the Confrontation Clause and Article 21 of the Maryland Declaration of Rights.

The conclusion that the Laboratory Report is formal is consistent with this Court's guidance in Norton, id. at 549 n.29, 117 A.3d at 1074 n.29, that "requiring such magic words as 'certification' would elevate form over substance[.]" (Citations omitted). In sum, using existing case law, I would hold that the Laboratory Report is testimonial because although it is not accusatory, it is a formalized statement that was expected to be used in a criminal prosecution and the admission of the Laboratory Report into evidence and testimony concerning the report from someone who was not the author violated the Confrontation Clause and right to confrontation under Article 21.

For the above reasons, respectfully, I concur.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/19a20cn.pdf